Frank W. CASS and Michael L. Cass, Appellants,

v.

Patricia Love STEPHENS, Individually and as Trustee of the Walter H. Stephens Trust, the SSH Trust, the Sutton Elizabeth Stephens Irrevocable Trust, and the Heather Love Stephens Irrevocable Trust, Appellees.

No. 08–97–00582–CV.

Court of Appeals of Texas, El Paso.

Aug. 31, 2004.

Rehearings Overruled Oct. 13, 2004.

Gregory K. Ackels, Marc S. Culp, Kolody Thomas & Blackwood, Dallas, for Appellants.

John A. "Jad" Davis, Turner & Davis, Midland, for Appellees.

Before Panel No. 3 BARAJAS, C.J., LARSEN, and CHEW, JJ.

## OPINION

DAVID WELLINGTON CHEW, Justice.

This is an oil and gas accounting case. Plaintiffs, Patricia Love Stephens, individually and as Trustee of the Walter H. Stephens Trust, the SSH Trust, the Sutton Elizabeth Stephens Irrevocable Trust, and the Heather Love Stephens Irrevocable Trust (collectively "stephens"), were working interest owners of certain oil and gas wells operated by the defendants Frank W. Cass, individually and d/b/a Cass Oil Company, Michael L. Cass, William G. Cass, and Cass Oil Company, Inc. Stephens sued the Cass defendants for breach of contract, conversion, and fraud. The Casses counterclaimed for breach of contract and defamation. A jury returned findings in favor of Stephens, finding Frank Cass, individually, liable for breach of contract, conversion, and fraud, and finding Michael Cass liable for conversion. The jury found against the Cass defendants on their counterclaims. The trial court entered judgment on the jury's verdict. On appeal, Frank and Michael Cass raise numerous points of error attacking the testimony of Stephens' expert witness, the legal and factual sufficiency of the evidence to support the jury's findings, and the trial court's imposition of sanctions for discovery abuses. We affirm and reform.

## SUMMARY OF THE EVIDENCE

In 1970, General Walter H. Stephens and Frank W. Cass formed an operating partnership known as Stephens & Cass. The partnership operated properties which General Stephens and Frank Cass acquired individually. From 1970 to 1977, the partnership successfully drilled and operated approximately sixty to seventy wells located in Reagan, Upton, Glassock, and Midland Counties.

In 1974, General Stephens' health began to decline. He suffered a broken hip and had to have surgery. Over the next two years, he had three more surgeries on his hip and eventually had to have his hip replaced. It appears that during this period, General Stephens was not able to

meaningfully participate in the daily activities of the partnership. By late 1977, Frank Cass desired to terminate his relationship with General Stephens and bring his son Michael L. Cass into the business.

On October 1, 1977, General Stephens and Frank Cass entered into an "Agreement to Terminate" the partnership. By this agreement, the two men agreed to wind up the business by January 1, 1978. They further agreed: to notify all of the other joint interest owners that Stephens & Cass had agreed to terminate their obligation as operator under the joint operating agreements ("JOAs"); that Mr. Cass would attempt to succeed the partnership as operator; that if Mr. Cass succeeded in obtaining the necessary votes under the JOAs, he would continue to operate the wells pursuant to the existing agreements; that Stephens & Cass would marshal and inventory all personal property owned by the partnership so that it could be valued; and finally that the records of Stephens & Cass would remain the property of both men and would be available to either one as required.

Pursuant to the foregoing agreement and the various JOAs, formal written ballots were administered, and Mr. Cass was elected operator by a majority-in-interest of the well owners. On January 1, 1978, Mr. Cass and the General entered into a new operating agreement recognizing that Mr. Cass had been elected operator. In 1980, Mr. Cass and General Stephens reached an agreement and assigned values to the personal property which they jointly owned.

In January of 1979, the General slipped on a patch of ice outside his home and suffered a broken back. The General's wife, Patricia Stephens, took him to the hospital. Apparently, he became overmedicated and slipped into a coma while at the hospital. His air supply was cut off for a period of time. The General eventually recovered, but developed a condition known as Pickwickian Syndrome which caused him to sleep excessively. Mrs. Stephens testified that her husband slept almost twenty hours a day from 1979 until his death in 1984. During this time, the General was unable to handle the vast majority of his financial affairs. Mrs. Stephens helped pay bills, but she testified that much of her husband's mail went unopened and that he failed to pay taxes for three years before his death.

After he became operator of the jointly-owned wells, Frank Cass threatened to resign on a number of occasions. He did so because he was discouraged by the working interest owners' failure to timely pay their monthly joint interest bills ("JIBs"). Mr. Cass related that he was being forced to put up his own money to pay vendors of the wells, and was losing money as the operator. In 1979, he sent a letter to all working interest owners stating that he was resigning as operator under the JOAs. The JOAs allowed an operator to resign, stating that all parties to the contract shall select by majority vote in interest a new operator. Nothing more was done or said about Mr. Cass's resignation and he continued to operate the wells for another three years. In 1982, Mr. Cass sent a letter notifying the working interest owners that he was changing the operator's name from his own to Cass Oil Company, Inc. From that point forward, all the working interest owners made their checks payable to Cass Oil Company, Inc., instead of Frank Cass.

On November 14, 1983, Mr. Cass purchased certain undeveloped lease-hold acreage from General Stephens. These undrilled locations were on the same leases as the jointly-owned wells ("the Stephens wells") and were direct offsets to them. The General passed away a few months

after he executed those assignments. After the General died, his properties passed to Mrs. Stephens, the Walter H. Stephens Trust, the SSH Trust, the Sutton Elizabeth Stephens Irrevocable Trust, and the Heather Love Stephens Irrevocable Trust. In 1984, solely-owned Cass wells were drilled on the offset locations ("the Cass companion wells").

In March of 1986, Mr. Cass sent Mrs. Stephens a letter proposing to shut in twenty-six of the Stephens' wells. Mrs. Stephens contacted Bob Franklin, an engineer who had appraised the wells for estate tax purposes following the General's death. Based on Mr. Franklin's advice, Mrs. Stephens wrote a letter asking Mr. Cass to show on a lease-by-lease basis how the leases would be held without production. In response, Mr. Cass called Mrs. Stephens and allegedly became very belligerent. Mrs. Stephens related that her conversation with Mr. Cass lasted for three hours, and that he was evasive and insulting. He told Mrs. Stephens that she did not know what she was talking about and neither did her engineer, her CPA, or her estate attorney.

Concerned that Mr. Cass was withholding information, Mrs. Stephens hired Gruy Petroleum Management Company ("gruy") to conduct an audit of the revenue and expenses of the jointly-owned wells ("the Gruy audit"). She also hired a private investigator who recommended that she conduct a "trash cover" — a routine pick up of Cass Oil Company's trash. The Gruy audit resulted in separate reports for revenue and expenses. The audit was limited in scope and time; it covered revenue and expenses from 1984 to 1986. It reported major discrepancies, $2.9 million in expense exceptions and $9 million in revenue exceptions.

## Pretrial Matters

Mrs. Stephens received the reports from Gruy in September of 1986. She then mailed copies to other working interest owners who had a financial stake in the wells. Mrs. Stephens filed suit against the Casses on November 4, 1986. Her petition alleged among other things that the Casses had breached the JOAs, converted jointly-owned property, and committed fraud. The Casses answered, denied the allegations, and counterclaimed against Mrs. Stephens for failure to pay her joint interest bills.

The first 1,000 pages of the clerk's record reflect a long and tortuous discovery battle. In July 1987, Stephens filed her first discovery request, seeking production of numerous documents. Over the ensuing months, a number of discovery hearings were held by the court and several orders were entered to compel discovery. Over the period from the actual commencement of discovery until May 1988, Cass produced and Stephens copied approximately 200,000 documents. In January 1988, Stephens filed a motion to compel further production and prevent destruction of documents. Also in January, Cass amended their answer asserting new and additional counterclaims against Stephens and against Gruy, which was impleaded as a third-party defendant. Damages were sought against Stephens and against Gruy, for negligently or intentionally conducting an improper audit and publishing a false report.

In May 1988, a hearing was held on various motions for protective orders. There it was revealed for the first time that Stephens, through her investigators, had recovered between 150,000 to 200,000 documents from Cass Oil Company's trash. The "trash cover" testimony indicated that Mr. Cass had been systematically discarding potentially discoverable documents

both before and after the filing of the lawsuit. Entire original files were thrown out, including the pump installation and well development files which were necessary to audit the joint interest accounts and to trace the movement of jointly-owned equipment. Mr. Cass even tore up and discarded the only signed copy of the original operating agreement.

In June of 1988, Stephens moved for sanctions against the Cass defendants for their repeated discovery abuses. The trial court set a hearing for September 12, 1988. The Casses then filed a motion to exclude or suppress the trash documents. The hearing on the motion for sanctions and the motion to exclude or suppress evidence started on September 12, and lasted eight days. On November 1, 1988, the trial court denied the Casses motion to exclude or suppress the trash documents. On November 7, 1988, the hearing on the motion for sanctions resumed and continued for four days during that month. The hearing resumed on April 3, 1989, and continued for eight days. Closing arguments were held on October 23, 1989. The trial court rendered an order imposing sanctions against the Casses on May 7, 1990. Among other things, the trial court's order struck the Cass defendants' answers, dismissed with prejudice the counterclaims, and entered a default judgment as to liability against them. All told, the hearing on the motion for sanctions lasted twenty-one days, involved more than eighty witnesses, and covers over 4,000 pages of reporter's record.

Appeal was taken to our Court. We dismissed for lack of jurisdiction holding that the trial court's order was not a final judgment and not appealable. *See Cass v. Stephens,* 823 S.W.2d 731, 734 (Tex.App.-El Paso 1992, no writ). In dismissing the cause, we suggested that the trial court reconsider its decision under the Texas Supreme Court's holdings in *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913 (Tex.1991) and *Braden v. Downey,* 811 S.W.2d 922 (Tex.1991). In November of 1993, pretrial matters were resumed. For the next thirteen months the parties continued the discovery process. In January of 1995, the Casses filed a number of motions for summary judgment based on limitations. In February, the Casses moved to disqualify Stephens' expert witness, Harold Eldridge. Stephens responded to the motions. On August 28, 1995, a hearing was held on the motion to disqualify Stephens' expert. The hearing lasted for two days. On September 5, 1995, the trial court denied the motion.

In November of 1995, the Casses moved for summary judgment on approximately seven different issues in the case. Stephens responded to the motions. The trial court denied the motions for summary judgment on March 18, 1996. Trial was then set for February 10, 1997. The Casses' attorney withdrew on November 5, 1996. The case was continued, and a new trial date was set for May 19, 1997. The Casses' new counsel did not appear until May 5, 1997.

### *The Trial*

The case went to trial on May 27, 1997, and was tried over the course of the next five weeks, finally ending on June 26, 1997. Stephens put on evidence showing that Frank Cass was the operator of the wells and that Cass Oil Company, Inc., was never elected operator or, alternatively, was the alter ego of Frank Cass. Harold Eldridge, Stephens' accounting expert, explained the evidence supporting the allegations against the Casses. He testified that the documentary evidence showed Frank Cass: made unauthorized expense charges on the jointly-owned Stephens' wells; overcharged expenses to the Stephens'

wells; repeatedly charged expenses incurred on the Cass companion wells to the Stephens' wells; often made the joint owners of the Stephens' wells pay for equipment they already owned; and finally converted jointly-owned equipment for use on the Cass companion wells without issuing any credit to the joint interest owners of the Stephens' wells. Numerous witnesses established that Frank Cass had thrown away thousands of documents which were necessary to audit the expenses incurred on the Stephens' wells, and to trace the movement of equipment from one well to another.

Mr. Eldridge's five volume report was admitted into evidence. The report summarized his testimony and shows on a per well basis his conclusions regarding the joint interest accounts. Stephens also admitted into evidence the report compiled by the Cass Defendants' accounting expert, Mr. David McKinnon. Stephens showed that Mr. McKinnon agreed with some of Mr. Eldridge's conclusions. In addition, hundreds of documents were admitted into evidence in support of Mr. Eldridge's report. The documents consist of material transfer invoices, well development files, operating agreements, the Agreement to Terminate, and various other documents.

The Cass Defendants put on evidence attempting to show that Cass Oil Company, Inc. was the operator of the wells. Counsel for the defendants repeatedly asserted that Mr. Eldridge's conclusions were not trustworthy and were biased in favor of Stephens. The Cass Defendants stated that the testimony and conclusions of its own accounting expert, Mr. David McKinnon, were more reliable. Portions of McKinnon's deposition were read into the record. The Cass Defendants also put on evidence showing that Stephens had not paid a portion of her 1986–87 joint interest

billing and, thus, owed them money. Both Frank and Michael Cass maintained that Mr. Eldridge's conclusion were incorrect, that they had done nothing wrong, and that both Gruy and Mrs. Stephens had slandered them.

### The Jury's Verdict

The jury considered the evidence and returned a verdict in favor of Stephens and against Frank and Michael Cass. Specifically, the jury found: that Frank Cass was the operator of the wells; that Cass Oil Company, Inc. was also the alter ego of Frank Cass; that Frank Cass had breached the operating agreements; that he had fraudulently concealed his breach; that Frank Cass committed common-law fraud by charging Stephens for goods and services that were never furnished to the Stephens' wells; that Frank and Michael Cass converted jointly-owned property for their own personal benefit; that Stephens had not breached the operating agreements; and that she had not defamed the Cass defendants.

The jury awarded Stephens: $317,905.59 as breach of contract damages accruing during the limitations period; $268,256.58 as breach of contract damages accruing outside the limitations period, but recoverable because of a fraudulent concealment finding; $68,136.69 as fraud damages accruing during the applicable limitations period; $33,164.23 as fraud accruing outside the limitations period, but recoverable because of a discovery rule finding; $14,070.38 as conversion damages accruing during the applicable limitations period; $84,710.44 as conversion damages outside the limitations period, but recoverable because of a discovery rule finding; $1,400,000 in attorney's fees for preparation of the breach of contract claim; $100,000 for an appeal to this Court; $50,000 for an appeal to the Texas Su-

preme Court; and $25,000 if a writ of error is granted by the Texas Supreme Court.

### Exemplary Damages

The jury heard additional testimony from Sutton and Patricia Stephens regarding the toll that the years of litigation had taken on them. The jury also heard from Frank, Michael, and Gregory Cass. Frank Cass asserted that he had exhausted his resources in defending the lawsuit and was strapped by debt. He specifically denied transferring any of his assets to his other family members in order to become judgment proof. Michael Cass testified in much the same vein, maintaining that he had no money despite being president of a publicly traded petroleum corporation. The jury was charged and later returned with a verdict awarding damages to Stephens. The jury awarded Stephens $5 and $15 million against Frank Cass for committing common-law fraud and conversion, respectively. The jury then awarded Stephens $20 million against Michael Cass for his conversion of jointly-owned property.

### Post Trial Matters

The Casses moved for judgment notwithstanding the verdict ("jnov"). The trial court denied the motion and entered judgment on the jury's verdict. The trial court's award included an additional $978,492.10 as a monetary sanction against Frank Cass for his discovery abuses. Frank and Michael Cass filed individual motions for new trial. The trial court overruled the motions by written order. Stephens voluntarily remitted $15 million of the awards against Frank Cass—$2.5 million of the fraud award and $12.5 million of the conversion award. Stephens also voluntarily remitted $17.5 million of the award against Michael Cass. Frank and Michael Cass timely filed separate notices of appeal and have filed separate briefs.

### SUMMARY OF THE ISSUES

Frank Cass raises six points of error: (1) there was insufficient evidence that he was personally liable for breach of contract, fraud, and conversion; (2) the evidence was insufficient to allow Stephens to recover outside the limitations period under the JOAs or, alternatively, the discovery and fraudulent concealment rules should not apply to toll the running of the appropriate limitation periods under each cause of action; (3) there is insufficient evidence to support the jury's award of exemplary damages; (4) there is insufficient evidence to support the award of compensatory damages; (5) there is insufficient evidence to support the jury's award of attorney's fees; and (6) the trial court erred in determining that sanctions should be imposed.

Michael Cass raises five points of error: (1) the failure to properly account for property moved between wells cannot as a matter of law constitute conversion; (2) there is insufficient evidence that he personally converted jointly-owned property; (3) there is insufficient evidence of the amount of damages resulting from his alleged conversion; (4) the discovery rule is inapplicable as a matter of law; and (5) the exemplary damages are unfounded and unjust.

### EXPERT TESTIMONY

We first address Eldridge's qualifications as an expert witness. This is a threshold issue because Eldridge's testimony provides crucial evidence to support many of the jury's findings. Although Frank and Michael have not attacked Eldridge's qualifications by separate point of error, they have included attacks on his qualifications as component parts of their

challenges to the jury's findings of liability and its award of actual and exemplary damages. We will therefore resolve the issue of Eldridge's competence, first, and address the more specific challenges to his testimony where appropriate.

■■■ The admissibility of expert testimony is governed by Rule 702 of the Texas Rules of Evidence. *See* Tex.R.Evid. 702. The qualification of a witness as an expert is within the trial court's discretion. *Broders v. Heise,* 924 S.W.2d 148, 151 (Tex. 1996). Rule 702 contains three requirements for the admission of expert testimony: the witness must be qualified; the proposed testimony must be scientific, technical, or other specialized knowledge; and the testimony must assist the trier of fact to understand the evidence or to determine a fact issue. *See* Tex.R.Evid. 702; *E.I. du Pont de Nemours & Co., Inc. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995). The party offering the expert's testimony bears the burden to prove that the witness is qualified under Rule 702. *See Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 718 (Tex.1998). The offering party must demonstrate that the witness possesses special knowledge as to the very matter on which he proposes to give an opinion. *Id.* The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles. *Robinson,* 923 S.W.2d at 558; *In re M.D.S.,* 1 S.W.3d 190, 203 (Tex.App.-Amarillo 1999, no pet.).

■■ Eldridge testified that he grew up around the oil and gas business, assisting his father in his used oil field equipment business through high school and college. In 1966, he graduated from McMurray College with a B.B.A. with emphasis in accounting. He became a certified public accountant ("CPA") in March of 1968. After college, he worked for Arthur Anderson & Company in Dallas, Texas, with clients engaged in the oil and gas, cement, manufacturing, and processing industries. He then became Vice President of Finance and Controller of Harding Brothers Oil Company, a company engaged in drilling, completing, and operating oil and gas wells. Eldridge related that he was responsible for all accounting functions, including billing on joint interest accounts. He was also responsible for accounting for new and used equipment of a Harding affiliate company called Pipe & Supply, Inc. After Harding, Eldridge worked for at least five other oil and gas companies. His duties routinely required him to handle accounting functions, joint interest billings, and tax matters. Next, Eldridge became managing partner and tax partner in charge of Coopers & Lybrand, Midland, Texas. There, he was responsible for the firm's due diligence activities. Since 1991, Mr. Eldridge has been a solo practitioner and consultant. In 1992, he also served as Bankruptcy Trustee for an oil and gas company that operated about 550 oil and gas wells.

Eldridge explained that he has performed joint interest audits of oil and gas operators for over twenty years. He spent approximately ten years with companies that operated hundreds of oil and gas wells. He related that he has extensive knowledge regarding operating agreements, title opinions, division of interest, joint interest billings, revenue distribution, accounting, billing, and collection. He is a member of the Council of Petroleum Accountants Society ("COPAS") and has served on the tax committee and the audit committee for the Permian Basin chapter. COPAS is the recognized authority for the petroleum accounting industry and is responsible for promulgating accounting procedures which are attached to virtually every operating agreement. Eldridge is also a member of The American Institute

of Certified Public Accountants ("AIC-PA"), and the Texas Society of Certified Public Accountants.

Eldridge was offered as an expert in petroleum accounting. Clearly, he possessed the requisite knowledge, skill, experience, training, and education regarding that specific issue. He was therefore qualified to give an expert opinion as to whether the Cass Defendants complied with the proper accounting procedures under the operating agreements. The proposed testimony was scientific, technical, and specialized. The testimony of a petroleum accountant would have clearly assisted the trier of fact to understand the evidence presented in this case, and would have helped the jury to determine the fact issues posed by the parties. We therefore conclude that the trial court did not abuse its discretion by admitting the testimony.

The Casses complain, however, that "Eldridge employed his own, self-invented, untested, and non-industry approved accounting method rather than the widely used and industry approved COPAS accounting procedure. . . ." Specifically, the Casses refer to Eldridge's use of a "Contract Compliance Verification Procedures." The Casses assert that this method of accounting is not recognized by any authority, is undefined, untested, and incapable of peer review because only Eldridge knows what the procedures entail. Their claim is founded on Eldridge's report wherein he stated that he called his auditing procedures "Contract Compliance Verification Procedures."

This complaint is not new, the Casses presented this claim to the trial court in their motion to disqualify Eldridge. The trial court held a two day hearing on the matter and overruled the Casses' motion.

The Casses reasserted their motion before Eldridge began testifying. The trial court overruled their objection. On direct examination during trial, Eldridge explained that the term "Contract Compliance Verification Procedures" was taken from CO-PAS Bulletin Number 3, Paragraph B which states that an expenditure audit of a joint account serves two main purposes: *verifying* and authenticating account charges and assuring *compliance with the operating agreements.* Throughout the litigation of this case, whether it was during his deposition, the hearing on the motion to disqualify, or during the trial, Eldridge did not waiver in his testimony that he followed accepted accounting methods and standards. Specifically, he relied on COPAS Bulletin Numbers 3, 5, 8, 16, 23, and 26, various pronouncements of AIC-PA, and the Rules of the Texas State Board of Public Accounting. These bulletins and pronouncements are all recognized as authoritative and controlling in auditing joint interest accounts. We conclude that the trial court did not err by admitting Eldridge's testimony. Accordingly, we overrule Frank and Michael's general complaints that the trial court abused its discretion by admitting Eldridge's testimony under Rule 702.[1]

### STANDARDS OF REVIEW

Because we will address numerous challenges to the sufficiency of the evidence, we first summarize the applicable standards of review.

#### *Legal Sufficiency*

"Legal sufficiency points of error assert a complete lack of evidence on an issue, and are designated as 'no evidence' points

---

1. These complaints involve arguments contained within Frank's Point of Error 4, and Michael's Points of Error 3, 4, and 6.

or 'matter of law' points, depending upon whether the complaining party had the burden of proof." W. Wendell Hall, *Standards of Review in Texas*, 29 St. Mary's L.J. 476–77 (1998). When an appellant attacks the legal sufficiency of an adverse finding on an issue on which he did not have the burden of proof at trial, the appellant must demonstrate on appeal that there is "no evidence" to support the adverse finding. Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex.L.Rev. 361, 364–68 (1960). The traditional statement of the "no evidence" standard of review is that the reviewing court considers only the evidence and inferences that tend to support the findings and disregards all evidence and inferences to the contrary. *See Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965); *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). A no evidence point will be sustained only when the record discloses: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. 38 Tex.L.Rev. at 362–63. More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, " 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.' " *Havner*, 953 S.W.2d at 711.

When an appellant attacks the legal sufficiency of an adverse finding on an issue on which he had the burden of proof at trial, he must demonstrate on appeal that all vital facts in support of the issue were conclusively established by the evidence, or as a "matter of law." *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989); *Kratz v. Exxon Corp.*, 890 S.W.2d

899, 902 (Tex.App.-El Paso 1994, no writ). In reviewing a "matter of law" challenge, the reviewing court engages in a two-step analysis. First, the record must be examined for evidence that supports the jury's finding, while ignoring all evidence to the contrary. Second, if there is no evidence to support the fact finder's answer, then, the entire record must be examined to see if the contrary proposition is established as a matter of law. *See Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 940 (Tex.1991).

### Factual Sufficiency

"Insufficient evidence" or factual insufficiency involves a finding that is so against the great weight and preponderance of the evidence as to be manifestly wrong. When the party having the burden of proof complains of an unfavorable finding, the point of error should allege that the findings "are against the great weight and preponderance of the evidence." The "insufficient evidence" point of error is appropriate only when the party without the burden of proof on an issue complains of the court's findings. *See Kimsey v. Kimsey*, 965 S.W.2d 690, 700 (Tex.App.-El Paso 1998, pet. denied).

The test for factual insufficiency points is set forth in *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). In reviewing an insufficiency of the evidence challenge, we must consider all of the evidence, both the evidence which tends to prove the existence of a vital fact as well as evidence which tends to disprove its existence. *Id.* After having done so, we will only set aside the finding if the evidence which supports the jury finding is so weak as to be clearly wrong and manifestly unjust. *See* 29 St. Mary's L.J. at 483–86. In reviewing a challenge that the jury finding is against the great weight and preponderance of the evidence, we must first examine the record

to determine if there is some evidence to support the finding. If such is the case, then we must determine, in light of the entire record, whether the finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong or manifestly unjust, or whether the great weight and preponderance supports its nonexistence. *See* 29 St. Mary's L.J. at 483–86.

In assessing a factual insufficiency point of error, we are guided by the rule that the reviewing court cannot substitute its conclusions for those of the fact finder. *In re B.R.*, 950 S.W.2d 113, 121 (Tex.App.-El Paso 1997, no pet.). If sufficient competent evidence of probative force exists to support the finding, it must be sustained. *Id.* We may not interfere with the fact finder's resolution of conflicts in the evidence or pass on the weight or credibility of the witnesses' testimony. *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792, 796 (1951); *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 30 (Tex.1994). Where conflicting evidence is present, the fact finder's determination on such matters is generally regarded as conclusive. *Kimsey*, 965 S.W.2d at 700; *In re B.R.*, 950 S.W.2d at 121.

■■■■ We note that the record is incomplete. The reporter's record shows that numerous exhibits were admitted into evidence. Only a portion of those exhibits are in the record here. It is observed that the Appellants have not properly designated a partial reporter's record pursuant to Tex.R.App.P. 34.6(c). At oral argument, we requested that the parties supplement the record with the exhibits they thought were necessary for our review. We have not received any supplementary exhibits. In order to obtain a reversal, the appellant has the burden to come forward with a record showing error which warrants reversal. *See Murray v. Devco, Ltd.*, 731

S.W.2d 555, 557 (Tex.1987). Because we have been asked to review a number of sufficiency challenges, the fact that we do not have a full record will impact our analysis of some issues. Under a legal sufficiency standard, we must be able to ascertain all of the evidence which supports the judgment in order to determine whether there is more than a scintilla of evidence to support the jury's verdict. Under a factual sufficiency standard, we must have all of the evidence in order to weigh the competing groups and determine whether the jury's verdict is clearly wrong or manifestly unjust. Generally, we presume that omitted evidence supports the findings of the jury and the judgment of the trial court. *Murray*, 731 S.W.2d at 557.

## PERSONAL LIABILITY

In his first point of error, Frank Cass asserts that the evidence is legally and factually insufficient to support the jury's findings that he was personally liable for the actions of Cass Oil Company, Inc. We focus on two findings by the jury: (1) that Frank Cass remained operator under JOAs; and (2) that Cass Oil Company, Inc. is the alter ego of Frank Cass.

### Operator Finding

In question number one, the jury was instructed that Frank Cass became operator of the properties on January 1, 1978, by a majority-in-interest vote. The jury was then instructed that an operator may resign from his duties at any time upon written notice, and that all parties to the agreement shall then select a new operator by majority-in-interest vote. The jury was further instructed that Frank did not remain operator if a majority-in-interest waived the requirement for an affirmative vote by consenting to the substitution of Cass Oil Company, Inc. as operator.

Waiver was defined as an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

On appeal, Frank argues that there is "no evidence" or "insufficient evidence" to support the jury's finding that he remained operator. He asserts that Stephens had notice of the change in operators and did not object. He relies on his own testimony that General Stephens consented to the change in operators. He also relies on evidence showing that Stephens made payments to Cass Oil Company, Inc., and that the Railroad Commission recognized Cass Oil Company, Inc., as the operator of the wells.

Considering his legal sufficiency challenge, first, we observe that Frank essentially argues that he established waiver as a matter of law. Waiver is an affirmative defense; Frank bore the burden for establishing this defense. See Tex.R.Civ.P. 94. To succeed on appeal, he must demonstrate that all vital facts in support of the issue were conclusively established by the evidence. See Sterner, 767 S.W.2d at 690; Kratz, 890 S.W.2d at 902. In applying the first step of our two-step analysis, we first consider whether there is any probative evidence to support the jury's finding. Kratz, 890 S.W.2d at 902.

■ Here, Frank admitted that he did not follow through with his 1979 resignation letter, and remained operator for the next three years. The parties stipulated that none of the JOAs identified Cass Oil Company, Inc., as operator. The only document which purports to change the operator name is the 1982 letter on Cass Oil Company, Inc. letterhead which notified the joint interest owners that the operator, Frank Cass, was changing his name to Cass Oil Company, Inc. Mr. Eldridge testified that operators often change their names without changing the entity itself.

Mrs. Stephens said that Frank did not need her permission to change his name. Mrs. Stephens and another interest owner, Bert Nelson, testified that they always looked to Frank as the operator of the wells. It is undisputed that Cass Oil Company, Inc. was never elected operator, did not solicit any votes to become operator, and that Mr. Cass knew and understood the procedure for changing operators.

■ We conclude that there is legally sufficient evidence to support the jury's finding that Frank remained operator. There clearly was a conflict in the evidence about which reasonable minds could disagree. The jury was instructed on waiver, heard Mr. Cass's theory of the evidence, and impliedly rejected his argument. Waiver is inherently a jury question. See Huffington v. Upchurch, 532 S.W.2d 576, 580 (Tex.1976). Finding evidence to support the finding, we dispense with the second step of our two-part analysis. Frank's legal sufficiency challenge is overruled.

We next consider whether the evidence is factually sufficient to support the jury's finding. Because Frank had the burden of proof to establish his waiver defense, we consider whether the jury's findings are so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong or manifestly unjust. As stated above, there was some evidence which supports the jury's finding, thus, we concentrate on the evidence which conflicts with the jury's finding. Frank relies primarily upon the 1979 resignation letter, the 1982 change-of-name letter, the fact that no one objected to the change in name of the operator, the fact that all of the joint interest owners made payment to Cass Oil Company, Inc., and the fact that the Texas Railroad Commission recognized Cass Oil Company, Inc. as the operator of the wells. This evidence is significant, however, it is

not conclusive on the issue of waiver. Frank's purported resignation is controverted by the fact that he remained the operator for three years after his alleged resignation. The operating agreements were never amended to show the election of a new operator. The JOAs are the basis for the parties legal rights, duties, and liabilities. The fact that no one objected to the change in the operator's name does not prove that the operator in fact changed from Frank Cass to Cass Oil Company, Inc. In addition, the fact that the Railroad Commission recognized Cass Oil Company, Inc. as the operator does not conclusively establish the matter as between the parties to the JOAs.

Here, the question of waiver centers on the intent and actions of the parties. The parties made a contract and provided that there was a specific and technical way to elect a new operator. Frank's evidence permits an inference that Stephens and the other joint interest owners may have waived their objections to the substitution of Cass Oil Company, Inc., as the operator, but it is not the only reasonable inference to be drawn from the evidence. The issue of waiver required the jury to weigh the testimony of Frank Cass against that of Mrs. Stephens, Bert Nelson, and Mr. Eldridge. It required that the jury resolve a clear conflict in the evidence. We conclude the jury's finding that Frank Cass remained operator, and its implied finding that Cass Oil Company, Inc., failed to become operator by waiver is not so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong or manifestly unjust. Accordingly, Frank Cass's factual sufficiency challenge is overruled.

### Alter Ego Finding

Here, Frank contends that there is no evidence or insufficient evidence to support the finding. Specifically, he argues that there is no evidence or insufficient evidence that he used Cass Oil Company, Inc., to commit an actual fraud for his own direct personal benefit.

 Under the alter ego theory, courts disregard the corporate entity when there exists such unity between corporation and individual that the corporation ceases to be separate and when holding only the corporation liable would promote injustice. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex.1990), citing *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex.1986). An alter ego relationship may be shown from the total dealings of the corporation and the individual. *Id.* at 272. This showing may include evidence of "the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes." *Id.* In order to hold a shareholder liable for a corporation's actions, Article 2.21 of the Texas Business Corporations Act requires a plaintiff to prove that the shareholder caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the plaintiff primarily for the direct benefit of the shareholder. *See* Tex.Rev.Civ.Stat.Ann. art. 2.21(A)(2)(Vernon Supp.2001); *see also, Menetti v. Chavers*, 974 S.W.2d 168, 173–75 (Tex.App.-San Antonio 1998, no pet.).

Frank first complains that there is no finding that he used Cass Oil Company, Inc., to commit an actual fraud on Stephens. He asserts that the jury's finding must be overturned because Article 2.21 requires a specific finding of actual fraud in connection with an alter ego finding. We agree that Article 2.21 requires a finding of actual fraud, but we disagree with

his contention that there is no such finding in this case. The jury was instructed that it could not find Cass Oil Company, Inc. was the alter ego of Frank unless it also found that Frank caused Cass Oil Company, Inc. to be used to perpetuate an actual fraud on Stephens. Thus, the jury impliedly found that Frank used the corporation to commit an actual fraud on Stephens when it found that the corporation was his alter ego. Frank made no objection to submitting the charge in this form and has not asserted on appeal that there is any error in the trial court's charge to the jury. Instead, he has chosen to attack the sufficiency of the evidence to support the alter ego finding. Additionally, we note that the jury specifically found that he committed common-law fraud by misrepresentation in question number thirteen of the jury charge. As a consequence, his complaint that there is no finding of actual fraud is overruled.

■ We now turn to Frank's legal sufficiency challenge to the implied finding of actual fraud. Stephens had the burden of proving that Frank caused Cass Oil Company, Inc. to perpetrate an actual fraud on her for his own direct benefit. Actual fraud by misrepresentation consists of a representation that is: (1) material; (2) false; (3) knowingly false or made with reckless disregard for its truth or falsity; (4) made with the intention that it be acted upon by the other party; (5) relied upon by the other party; and (6) damaging to the other party. *Menetti,* 974 S.W.2d at 175.

■ Stephens put on evidence showing that the Stephens' wells were billed for numerous goods and services provided solely to the Cass companion wells. Mr. Eldridge testified that Cass Oil Company billed the Stephens' wells for ad valorem tax services, salt water hauling services, electricity, and road work, which were incurred by Cass companion wells. Moreover, Eldridge explained that numerous delivery tickets and vendor's invoices were modified by Frank in order to divert expenses from the Cass companion wells to the Stephens' wells. The jury was shown exhibits which apparently showed that Frank modified the tickets and invoices, and approved the charges, often with his own handwriting. Those documents, Plaintiff's Exhibits 1202 A through 1202 TTT, are not a part of the record on appeal, but were admitted into evidence.[2] Mr. Eldridge's report also contains evidence that Stephens was charged operating expenses for wells that were inactive.

From this evidence, a jury could rationally find that Frank used Cass Oil Company, Inc. to perpetuate a fraud on Stephens. The evidence shows that he charged expenses incurred on the Cass companion wells to the Stephens' wells. These charges showed up on the joint interest bills as apparently legitimate charges for operating expenses. The charges were material representations that Stephens owed money for expenses which she in fact had not incurred. A rational jury could have found that Frank knowingly submitted the false bills from the fact that he personally altered and signed many of the tickets and invoices which misallocated the operating expenses. It is also reasonable to infer that the bills were made with the intent that Stephens rely upon them. There is evidence that she in fact paid the bills to her detriment. Viewed in the light most favorable, we conclude that there is legally sufficient evidence to support the jury's implied finding. Accordingly, we

---

2. Apparently, these exhibits consist of four boxes of notebooks containing invoices, mate-rial transfer orders, and other documents supporting Eldridge's conclusions.

overrule Frank's legal sufficiency challenge.

We now consider whether the evidence is factually sufficient to support the jury's implied finding, and turn to the evidence which conflicts with the jury's determination. Frank urges that we consider the fact that he owned an equal if not greater interest in the Stephens' wells than Appellees. He points out that if the Stephens' wells were improperly charged, then he was improperly charged as well. He also relies on Eldridge's statement that he could not find any evidence that Frank personally received any money from the affiliate companies that overcharged the Stephens' wells for goods and services. Frank argues that there is no proof that any of the overcharges benefited him personally.

We are unpersuaded by this argument. Assuming he paid the charges, he is no doubt correct in asserting that he still had to pay a proportional share of the misapplied charges. But that does not end our analysis. The evidence clearly shows that Frank generally owned an interest of 43.7 percent to 50 percent in the Cass companion wells, with his own family members owning the rest. By contrast, Frank Cass generally owned smaller interests in the Stephens' wells — anywhere from a low of 12 percent to a high of 50 percent — with the remaining interest owned by Stephens and various other persons. Allocating charges to an account in which an individual owns a smaller interest benefits him economically. If he bills $100 to an account that he owns a 100 percent share in, he pays $100. If he bills $100 to an account that he owns a 50 percent share in, he pays $50. If he misallocates a bill of $100 to an account that he owns a 20 percent share in, rather than an account that he owns a 50 percent interest in, then he pays $20 rather than $50. The jury could properly infer that Frank personally benefited from the misallocation of expenses to the Stephens' wells. The jury was also at liberty to consider the benefit which inured to Frank when his family received free goods and services at the expense of others. Having assayed all the evidence, we conclude that the evidence that supports the jury's verdict is not so weak as to be clearly wrong and manifestly unjust. Frank's factual sufficiency complaint is overruled.

In summary, we conclude that there is both legally and factually sufficient evidence to support the jury's findings that Frank remained the operator under the JOAs, and that Cass Oil Company, Inc. was his alter ego. Frank's first point of error is overruled.

### FRAUD

In his fourth point of error, Frank complains that there is legally and factually insufficient evidence to support the jury's findings that he committed fraud and conversion. As noted, the jury found that Frank Cass had committed common-law fraud by misrepresentation in question number thirteen of the jury charge. In light of our analysis above, we overrule Frank's sufficiency challenge to the fraud finding.

### CONVERSION

We now consider Frank and Michael's attack on the jury's conversion findings.[3] Conversion is the unauthorized and unlawful assumption and exercise of dominion and control over the personal

---

**3.** This challenge involves a portion of Frank's fourth point of error, and Michael's first, second, and third points of error.

property of another which is to the exclusion of, or inconsistent with, the owner's rights. *Waisath v. Lack's Stores, Inc.,* 474 S.W.2d 444, 446 (Tex.1971); *Whitaker v. Bank of El Paso,* 850 S.W.2d 757, 760 (Tex.App.-El Paso 1993, no writ). Plaintiff must prove that at the time of the conversion, he was the owner of the property, had legal possession of it, or was entitled to possession. *Whitaker,* 850 S.W.2d at 760.

Here, the JOAs created a cotenancy relationship. *Rankin v. Naftalis,* 557 S.W.2d 940, 946 (Tex.1977); *Hamilton v. Texas Oil & Gas Corp.* 648 S.W.2d 316, 321 (Tex.App.-El Paso 1982, writ ref'd n.r.e.); *Donnan v. Atlantic Richfield,* 732 S.W.2d 715, 717 (Tex.App.-Corpus Christi 1987, writ denied). Each working interest owner held an undivided interest in the property. A cotenant has the right to be in possession of the property in which he owns an interest. *Todd v. Bruner,* 365 S.W.2d 155, 160 (Tex.1963); *Tynes v. Mauro,* 860 S.W.2d 168, 176 (Tex.App.-El Paso 1993, writ denied). The operator was given full control of all operations, but each working interest owner had the right to enter the common estate.

A cotenant may maintain a conversion suit against another cotenant who has appropriated the entire commonly owned property for his own use and benefit. *Grabes v. Fawcett,* 307 S.W.2d 311, 315 (Tex.Civ.App.-Texarkana 1957, no writ). If possession is initially lawful, demand and refusal to return the property may be required for the cause of action to accrue. *See Hofland v. Elgin–Butler Brick Co.,* 834 S.W.2d 409, 413 (Tex.App.-Corpus Christi 1992, no writ); *Young v. J & J Bail Bonds Co.,* 792 S.W.2d 484, 485 (Tex.App.-El Paso 1990, no writ). Demand and refusal are not necessary, however, when the possessor's acts manifest a clear repudiation of the plaintiff's rights.

*Whitaker,* 850 S.W.2d at 760; *Hofland,* 834 S.W.2d at 414.

The record contains evidence that jointly-owned equipment was transferred from Stephens' wells to Cass companion wells. Eldridge's report contains a section related to material transfers. His five volume report goes into detail on a well-by-well basis and summarizes the transfers of jointly-owned equipment to the Cass companion wells. Eldridge testified that he was able to reconstruct the movement of the jointly-owned equipment by using the trash documents. Exhibits 704, 704A, 706, and 708 are handwritten notes by Cass employees concerning the material transfers. Exhibits 707, 707A, and 707B, are Frank's own handwritten notes concerning the material transfers. Using these handwritten notes, and various developments files thrown away by Frank, Eldridge discovered that the Casses transferred jointly-owned equipment to the companion wells without giving credit to the Stephens' wells. The Casses later sold their interests in the companion wells to a third party for $12 million.

One of the examples given to the jury was the equipment transfers regarding the Ganze 7–1 well. Exhibit 708 shows that a pump jack was moved to the Ganze 7–1, a Stephens' well, in November 1975, and the joint account was billed $14,850. In February 1980, the pump jack was moved to the Driver 34–2, another Stephens' well. The joint account was again billed another $14,850 for the pump plus $1,200 for a concrete base, and no credit was issued to the Ganze well. Later, the pump jack was moved to the Smith 1, a Cass companion well, and no credit was issued to the Driver. The net effect of these transfers is that Stephens paid twice for a pump jack, that was then moved to a Cass companion well, and was later sold to a third party,

without any credit being issued for the transfers.

■■■ First, Frank and Michael both assert that there is legally and factually insufficient evidence to support a conversion finding because there is no proof that their exercise of dominion and control over the property was unauthorized or unlawful. Specifically, they argue that the COPAS accounting procedures attached to the JOAs authorized the operator to move jointly-owned equipment between the wells, and also authorized the operator to purchase or take equipment in kind. They contend that their failure to properly account for the movement of equipment was a breach of contract, not conversion. We disagree.

We find compelling evidence which supports the jury's findings. The evidence shows that Frank and Michael moved jointly-owned equipment to their solely owned wells without giving credit to the joint accounts. The evidence also shows a pattern of abuses by the Casses: making the joint interest owners pay multiple times for the same property; discontinuing their procedures for documenting material transfers thereby making it harder to trace the property movements transfers; the destruction of documents which show the equipment transfers; failing to give the Gruy auditors the documents necessary for tracing the equipment transfers; and finally the sale of the jointly-owned property to a third party. From this evidence, the jury reasonably could infer that the accounting errors were not just fortuitous or by accident, but were intentionally done so that the Casses would benefit at the expense of others. The evidence clearly supports the findings that Frank and Michael unlawfully appropriated the jointly-owned equipment for their own use and benefit.

While accounting procedures authorize the operator to purchase jointly-owned equipment, the context here is that the Casses removed large amounts of jointly-owned equipment to their solely owned wells without paying for the equipment. The facts also show a pattern of deception concerning the movements of the equipment and an attempt to hide the transfers. These facts may prove a breach of the operating agreements, but they also support a claim for conversion. Considering the evidence, the jury was free to infer that the prolonged retention of the equipment without payment was an act of conversion and not merely a breach of contract. We conclude that there is legally and factually sufficient evidence to support the jury's findings.

Second, Michael Cass claims that there is insufficient evidence that he personally converted any equipment. He asserts that the evidence does not support a finding that he used the property for his own personal benefit. Essentially, he claims ignorance of the accounting errors made by his father. He argues that he should not be responsible for his father's wrongful acts.

■■■ A corporate officer or agent is always primarily liable for his own torts, even though the principal is also vicariously liable. *Permian Petroleum Co. v. Barrow*, 484 S.W.2d 631, 634 (Tex.Civ.App.-El Paso 1972, no writ); *Portlock v. Perry*, 852 S.W.2d 578, 582 (Tex.App.-Dallas 1993, writ denied). An employee may be held individually liable for an employer's tortious acts if he knowingly participates in the conduct or has knowledge of the tortious conduct, either actual or constructive. *Portlock*, 852 S.W.2d at 582. Instigating, aiding, or abetting the wrongdoing constitutes participation. *Permian Petroleum Co.*, 484 S.W.2d at 634. The employee or agent may be held liable regardless of

whether he receives any personal benefit from the tortious act. *Gardner Machinery Corp. v. U.C. Leasing, Inc.*, 561 S.W.2d 897, 899 (Tex.Civ.App.-Beaumont 1978, writ dism'd).

■ The evidence shows that during the period from 1977 to 1978, Michael Cass had responsibility for most aspects of drilling and field operations. He then moved back to Dallas and helped his father run the business. The record contains material transfer orders with Michael Cass's initials approving equipment transfers. Eldridge testified that Michael Cass's initialed and approved many of the transfers of equipment from the Stephens' wells to the Cass companion wells. From this evidence, the jury reasonably could infer that Michael Cass had knowledge of the transfers, that he participated in the conversions, and that he personally benefited from the transfers. We conclude that there is both legally and factually sufficient evidence to support the findings of liability against Michael.

■ Third, Frank and Michael complain that the evidence is insufficient to support the jury's award of damages. The measure of damages for conversion is the value of the property at the time and place of the conversion. *Prewitt v. Branham*, 643 S.W.2d 122, 123 (Tex.1982)(per curiam); *Edlund v. Bounds*, 842 S.W.2d 719, 727 (Tex.App.-Dallas 1992, writ denied). The Casses argue that there is no competent evidence proving the market value of the converted property. Specifically, they contend: that Eldridge was not qualified to state an opinion as to the market value of the equipment; that he did not supply any information concerning the market value of the equipment; and that his damage calculations were based on erroneous facts.

■ The record reflects that the Casses have not preserved their complaints for our review. Although Michael and his father filed a motion to exclude Eldridge's testimony, the motion did not raise the three issues now asserted. To preserve a complaint that scientific evidence is unreliable and thus, no evidence, a party must object to the evidence before trial or when the evidence is offered. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex.1998). Without requiring a timely objection to the reliability of the scientific evidence, the offering party is not given an opportunity to cure any defect that may exist, and will be subject to trial and appeal by ambush. *Id.* During the second day of trial, the trial court warned the Cass Defendants that he could not rule on general complaints lodged against Eldridge's testimony. The trial court told them to object to the specific testimony they believed was unreliable. We also observe that the evidence concerning the market value of the equipment was presented over a number of days and Eldridge's entire report was admitted into evidence. If in fact there was an objection remotely close to the contentions raised here, it no doubt has been waived because the same evidence was presented elsewhere in the record without objection. *Richardson v. Green*, 677 S.W.2d 497, 501 (Tex.1984).

■ Assuming, arguendo, that the complaints had been preserved, the record contains evidence showing that Eldridge was qualified to give an opinion as to the market value of the equipment. For over twenty years, Eldridge has been closely associated with the financial operations of numerous oil and gas businesses. He has handled tax matters, accounting matters, and matters related to the drilling, completion, and operation of oil and gas wells. Specifically, he has accounted for both new

and used equipment during his extensive career. Eldridge stated that he relied on the COPAS bulletins, the recognized authorities for oil and gas accounting, in determining the equipment values. Clearly, Eldridge was qualified to state an opinion regarding the market value of the converted equipment.

In summary, we conclude there is both legally and factually sufficient evidence to support the jury's findings of conversion against Frank and Michael. There is also evidence to support the jury's award of damages. Accordingly, we overrule those portions of Frank's fourth point of error which challenge the sufficiency of the evidence to support the conversion finding and the award of damages; we also overrule Michael's first, second, and third points of error.

## LIMITATIONS

The next issue for consideration regards the jury's fraudulent concealment and discovery rule findings. Fraudulent concealment is an affirmative defense to the statute of limitations. *Weaver v. Witt*, 561 S.W.2d 792, 793 (Tex. 1977). It is based upon the doctrine of equitable estoppel. In the proper case, invocation of fraudulent concealment estops a defendant from relying on the statute of limitations as an affirmative defense to plaintiff's claim. Where a defendant is under a duty to make disclosure but fraudulently conceals the existence of a cause of action from the party to whom it belongs, the defendant is estopped from relying on the defense of limitations until the party learns of the right of action or should have learned thereof through the exercise of reasonable diligence. *See Borderlon v. Peck*, 661 S.W.2d 907, 909 (Tex.1983); *see also, Computer Associates International Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455–56 (Tex.1996). The plaintiff has the burden

of coming forward with proof to support the allegation. *Weaver*, 561 S.W.2d at 793. In summary, the plaintiff must show: (1) existence of the underlying tort; (2) the defendant's knowledge of the tort; (3) the defendant's use of deception to conceal the tort; and (4) the plaintiff's reasonable reliance on the deception. *Arabian Shield Development Co. v. Hunt*, 808 S.W.2d 577, 584 (Tex.App.-Dallas 1991, writ denied). Fraudulent concealment applies to any cause of action, including breach of contract claims. *Hurbrough v. Cain*, 571 S.W.2d 216, 221 (Tex.Civ.App.-Tyler 1978, no writ)(Opin. on reh'g); *Shipp v. O'Dowd*, 454 S.W.2d 845, 847 (Tex.Civ.App.-Waco 1970, writ ref'd n.r.e.).

The discovery rule is not a plea of confession and avoidance, rather, it is a test to be applied in determining when a plaintiff's cause of action accrued. *Weaver*, 561 S.W.2d at 794. The rule applies as an exception to the statute of limitations when the injury is inherently undiscoverable and objectively verifiable. *Computer Associates International, Inc.*, 918 S.W.2d at 456. The discovery rule exception defers accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action. *Id.* at 455, *citing Trinity River Auth. v. URS Consultants*, 889 S.W.2d 259, 262 (Tex.1994).

### *Fraudulent Concealment*

Under the accounting procedures attached to the parties JOAs, Stephens had two years to bring a claim for a billing adjustment following the expiration of the calendar year in which the billing was made. Pursuant to this limitations period, Stephens first obtained jury findings that Frank had breached the operating agreements during the period from January 1, 1984, until the date suit was filed on No-

vember 4, 1986. The jury awarded Stephens $317,905.59 as damages for these breaches of the operating agreements. Next, Stephens obtained findings: that Frank fraudulently concealed the breach of contract claims; that the earliest date Stephens had knowledge of the concealment was March 1, 1986; and that the concealed breaches, outside of the two-year limitations period, were worth $268,256.58 in damages.

First, Frank asserts that there is no evidence or insufficient evidence to support the fraudulent concealment findings. We disagree. Eldridge identified seventeen categories of breaches of the operating agreements. These categories include overcharges for fixed rate overhead, field supervision fees, legal fees, revenue distribution fees, contract operations, unauthorized expenditures, seven different overcharges for affiliate services, and other exceptions. In addition, there were numerous unauthorized charges for costs related to the Cass companion wells. Eldridge provided days of testimony explaining these items in detail, and he was cross-examined for at least six days of the trial.

Burt Nelson related that Frank was meticulous in nature, closely scrutinizing his books and records. Gregg Cass testified that his father reviewed the joint interest billings before they were sent out. There was evidence that Frank suspended many of the accounting procedures used by Stephens & Cass to document joint interest expenses. Eldridge explained that Frank kept a very detailed accounting of the expenditures for himself, but sent out a very condensed and abbreviated accounting to the joint interest owners. He stated that Stephens' version contained little information concerning the details of the expenditures. He explained that this procedure was highly unusual and irregular in the oil and gas business. Moreover, he opined that the procedure was implemented to keep Stephens from discovering the types of costs that were being billed to the joint accounts.

There was also evidence that Frank specifically tried to conceal his relationship with numerous affiliate companies. Eldridge recounted that he had seen stock books, stock registers, corporate minutes, minutes from organizational meetings, copies of checks, and letters, which supported his conclusion that companies such as General Water Haulers, Major Pipe, and Apple Cass were affiliates owned and controlled by the Casses.[4] He noted that the relationships had not been disclosed to the Gruy auditors. Moreover, there is the undisputed evidence that Frank threw away documents that were not disclosed to Gruy and were relevant to Stephens' discovery requests.

From this evidence, a rational jury could infer: that numerous breach of contract claims existed; that Frank Cass had knowledge of the claims; that he used deception to conceal the claims; and that Stephens relied on the deception when she paid her bills. We conclude that there is legally sufficient evidence to support the jury's fraudulent concealment findings. *See Arabian Shield Development Co.*, 808 S.W.2d at 584.

Next, we consider whether the evidence is factually sufficient. Frank claims that Stephens failed to use diligence in detecting her cause of action. He claims that there can be no fraudulent concealment because she was authorized, under the

4. The record does not include most of the exhibits relied upon by Eldridge. It seems that the jury considered Plaintiffs' Exhibits 1223 through 1243 in determining that Frank overcharged Stephens for expenses charged by affiliated companies.

JOAs, to review the company's records anytime she wanted. He claims that her failure to do so bars her claims. To support his position, Frank relies on his own testimony that General Stephens regularly discussed the joint interest bills with him and was very knowledgeable about them. He points to the fact that General Stephens made a $225,000 prepayment of expenses in December of 1983, and argues that it shows the General agreed with his operating procedures. Finally, Frank points to testimony by Mrs. Stephens that he always gave her and the General every document they ever requested, prior to the commencement of the lawsuit.

We conclude that the jury's finding is not so against the great weight and preponderance of the evidence as to be clearly wrong or manifestly unjust. Here, there is compelling evidence that Frank would not have disclosed any documents which established his misconduct had Stephens requested to see the records. The jury was aware that Frank had not disclosed all of the records to Gruy, and that he attempted to destroy evidence of his wrongdoing. The jury could rationally have inferred that Frank would not have disclosed any documents establishing his misconduct had Stephens requested the documents. Frank's testimony that the General regularly discussed the joint interest bills with him, and was knowledgeable about them, stands in strong contrast to the portrait of the General as weak, soporific, and unable to manage his financial affairs during the later years of his life. It was for the jury to resolve the conflicts in the evidence and to assess Frank's credibility. The fact that the General prepaid his expenses permits an inference that the General approved and trusted Frank's actions as operator. It does not, however, prove that the General was aware of Frank's breaches of the operating agreements, that he approved of them, or that he was in any

way aware of Frank's misconduct. On the contrary, Stephens' evidence supports an inference that she would not have been able to detect many of the breaches of the operating agreements until after she recovered the trash documents. Finally, the fact that Frank gave Stephens all the documents she requested, prior to the lawsuit, does not prove that Frank did not conceal his breaches of the operating agreements. A review of the entire record demonstrates that Frank presented his theory to the jury, and that the jury rejected his position. The jury was the sole judge of the credibility of the witnesses, and it was their duty to resolve the conflicts in the evidence. Accordingly, we overrule Frank's factual sufficiency challenge.

### Discovery Rule

Again, as discussed above, the jury found that Frank Cass committed common-law fraud in question number thirteen of the jury charge. The statute of limitations for fraud claims is four years. Tex. Civ.Prac. & Rem.Code Ann. § 16.004 (Vernon Supp.2001). In question number fourteen, Stephens obtained a jury finding awarding her damages of $68,136.69 for the acts of fraud committed within the four-year limitations period. Next, she obtained findings that she could not have discovered the fraud before September 24, 1986, and that her damages for the acts of fraud committed outside the limitations period were $33,164.23. The findings that Frank and Michael converted jointly-owned equipment are similar to the fraud findings. Stephens first obtained findings that Frank and Michael converted $14,070.38 of equipment during the applicable two-year statute of limitations. Tex. Civ.Prac. & Rem.Code Ann. § 16.003. Next, she obtained findings that the conversion of equipment could not have been discovered before September 24, 1986, and

that her damages for conversion outside the applicable limitations period was $84,710.44.

First, we address Frank's assertion that the discovery rule does not apply to breach of contract claims. The record clearly shows that the discovery rule findings were returned on the fraud and conversion claims. Fraudulent concealment was the theory used to extend Frank's liability beyond the limitations period set out in the JOAs. We therefore overrule this complaint.

■ Second, we address Frank's challenges to the sufficiency of the evidence to support the discovery rule findings on Stephens' fraud claims. Frank once again argues that Stephens failed to use reasonable diligence in ascertaining her causes of action against him. He contends that Stephens could have requested the records and discovered his fraudulent behavior. He asserts that his misconduct was so obvious that it was inherently discoverable.

We have already concluded that there was legally and factually sufficient evidence to support the fraud findings against Frank. In finding fraud, the jury impliedly found that Frank knowingly made material misrepresentations on the joint interest bills intending that the joint owners rely on those misrepresentations. Texas courts have long adhered to the view that fraud vitiates whatever it touches, and have consistently held that a party will not be permitted to avail himself of the protection of a limitations statute when by his own fraud he has prevented the other party from seeking redress within the period of limitations. See *Borderlon*, 661 S.W.2d at 908–09. To reward a wrongdoer for his own fraudulent contrivance would make the statute a means of encouraging rather than preventing fraud. *Id.*

Whether Stephens would have received the documents she needed to discover Frank's acts of fraud is debatable. Reasonable minds could differ about what the evidence shows. Here, the jury was aware of Frank's attempts to avoid detection by failing to disclose information on the joint interest billings, failing to disclose all documents to Gruy, and by his destruction of evidence. The jury was also offered testimony that the fraud was not readily discoverable from the joint interest bills. From this evidence, the jury rationally could have found that Frank's acts of fraud were not inherently discoverable. We conclude that there is legally and factually sufficient evidence to support the jury's findings.

■ Third, we consider Frank and Michael's assertion that the discovery rule does not apply to conversion claims. We disagree. In *Sunwest Bank of El Paso v. Basil Smith Engineering Co., Inc.*, we said that a cause of action for conversion ordinarily accrues on the date of conversion unless possession was initially lawful. 939 S.W.2d 671, 674 (Tex.App.-El Paso 1996, writ denied). When possession is initially lawful, a cause of action for conversion accrues upon demand and refusal, or discovery of facts supporting the cause of action, whichever occurs first. *Hofland*, 834 S.W.2d at 414. Here, the possession was initially lawful and no demand was made before Stephens discovered her injury. Consequently, we overrule this complaint.

■ Fourth, we address Frank's challenge to the sufficiency of the evidence to support the discovery rule findings on Stephens' conversion claims. Frank asserts that the discovery rule is inapplicable because the facts show that the injury was inherently discoverable. Again, he asserts the fact that Stephens could have requested and audited the company records at

anytime. In the present case, Frank and Michael had exclusive possession and control over the jointly-owned equipment. Stephens had no reason to know that the Casses had secretly transferred the equipment to the companion wells, or that they later sold the equipment to a third party. Many of the acts of conversion by Frank and Michael were only discovered after the Gruy audit was complete and the trash documents were recovered. We conclude that the injuries were not inherently discoverable, *Hofland*, 834 S.W.2d at 414, and that there is legally and factually sufficient evidence to support the jury's findings.

In summary, we conclude that the jury's fraudulent concealment and discovery rule findings are supported by legally and factually sufficient evidence. As a consequence, Stephens' claims are not restricted by the ordinary accrual dates under the relevant statutes of limitation for breach of contract, fraud, and conversion. Accordingly, we overrule Frank's second and Michael's fourth points of error.

## TORT OR CONTRACT

We now address Frank and Michael's complaint that Stephens is barred as a matter of law from any tort recovery in this case because her claims only sound in contract. We have already concluded that there is sufficient evidence to support the jury's findings on Stephens' fraud and conversion claims. Now we address whether her tort claims are sufficiently independent from her breach of contract claim.

The law of "contorts" is a muddy area, devoid of bright line rules or easy answers as to what conduct constitutes a tort, and what a breach of contract. The acts of a party may breach duties in tort or contract alone, or simultaneously in both. The Texas Supreme Court has observed that it is the nature of the injury which is most helpful in determining which duty or duties are breached. When the injury is only economic loss to the subject of a contract itself, the action sounds in contract alone. *Southwestern Bell Telephone Company v. DeLanney*, 809 S.W.2d 493, 495 (Tex.1991); *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986); *Airborne Freight Corp., Inc. v. C.R. Lee Enterprises, Inc.*, 847 S.W.2d 289, 293 (Tex. App.-El Paso 1992, writ denied). Contract obligations arise from a specific agreement between the parties. Tort obligations, in contrast, are those that are imposed by law—apart from and independent of promises made. *DeLanney*, 809 S.W.2d at 494; *Airborne Freight Corp., Inc.*, 847 S.W.2d at 294.

Here, Stephens carefully delineated between the acts that were alleged to be breaches of contract, fraud, and conversion. She designated the numerous categories of overcharges and the charges for expenses not authorized by the JOAs as breach of contract injuries. She designated the charges for expenses related to the Cass companion wells and the charges for property already owned by the joint owners as fraud injuries. She designated the removal of jointly-owned equipment to the Cass companion wells as conversion injuries.

### Fraud

First, we consider whether Frank's conduct breached an obligation at law or in contract. In this case, the JOAs authorized Frank to bill the joint interest owners for certain expenses incurred in operating the jointly held leases. The agreements did not authorize Frank to bill the joint accounts for expenses incurred on the Cass companion wells, or to double-bill for equipment already owned by the joint accounts. We conclude that Frank breached a duty imposed by law when he fraudulently induced the joint interest

owners to pay for goods and services they never received. Specifically, Frank induced the joint interest owners to pay for the goods and services by submitting bills that intentionally misrepresented that they were authorized by the agreements. Thus, the agreements created a conduit for committing the torts, but the duty breached exists independent from the agreements.

Second, we consider the nature of the injury. Here, the subject matter of the agreements is the operation of the jointly-owned wells. To the extent that Stephens was billed for goods and services that went to the Cass companion wells, her damages relate to charges that are independent of the JOAs. In addition, we reject the contention that Stephens' injury is contractual because she recovered economic damages. *See Formosa Plastics Corp. U.S.A. v. Presidio Engineers & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex.1998)(holding that tort damages are not precluded simply because the tort causes only economic loss). Frank's fraud caused the joint interest owners to pay for good and services they never received. Logically, their damages are economic—fraudulently induced payment of money results in money damages. We conclude that the injury is tortious in nature.

### Conversion

◼ First, we consider the obligation breached. Frank and Michael's unlawful appropriation of the jointly-owned equipment, for the use and benefit of their solely owned wells, breached an obligation that exists independent of the JOAs. Just as the unauthorized removal by a third party constitutes theft, the unauthorized appropriation of the jointly-owned equipment, here, constitutes conversion. The conduct breaches an obligation which exists outside the contract, and had nothing

to do with the JOAs. As a consequence, we conclude that Frank and Michael breached a duty imposed by law.

Second, we consider the nature of the injury. Here, the injury consists not only of the misappropriation of the equipment, but also the deception regarding the equipment transfers. The damages relate to the removal of the equipment to the Cass companion wells and, therefore, do not concern the subject matter of the JOAs— the Stephens' wells. Stated differently, the injury breaches Frank and Michael's legal duty to avoid converting the jointly-owned equipment, not just their contractual duty to honestly account for the movement of the equipment. We conclude that the injury is tortious in nature.

Having considered the obligations breached and the nature of the injuries, we conclude that Stephens' tort claims are sufficiently independent from her contract claim. Accordingly, we overrule Frank's third point of error, and Michael's complaint contained within his second point of error.

### OFFSET

We now address Frank's complaint that he is entitled to an offset for monies owed by Stephens. He contends that Stephens did not pay Cass Oil Company, Inc. for her share of the operating expenses. The record reflects that Stephens paid her share of the operating expenses into the registry of the trial court. Stephens testified that the amount paid into the registry was approximately $130,000. Stephens also said that she did not know what needed to be deducted from Eldridge's report, but was confident that Frank's counsel would let her know. Eldridge testified that he did not know whether Frank was entitled to an offset. He also stated that he did not know what amount of money was in the registry, whether the expense charges

were legitimate, nor did he know what Stephens' balance was at the time the suit was filed.

The right to offset is an affirmative defense and the burden of pleading and proving the facts necessary to support offset are on the party making the assertion. *See Brown v. American Transfer & Storage Co.,* 601 S.W.2d 931, 936 (Tex. 1980); *Rauscher Pierce Refsnes, Inc. v. Great Southwest Sav., F.A.,* 923 S.W.2d 112, 117 (Tex.App.-Houston [14th Dist.] 1996, no writ). The elements necessary to prove a suit on a sworn account are: (1) a sale and delivery of goods or services; (2) the charges on account are just, i.e., prices are charged in accordance with agreement or, in absence of agreement, are usual, customary, and reasonable prices for that good or service; and (3) the amount remains unpaid. Tex.R.Civ.P. 185; *Andrews v. East Texas Medical Center—Athens,* 885 S.W.2d 264, 266 (Tex.App.-Tyler 1994, no writ).

We conclude that Frank failed to prove his affirmative defense. It was not enough to prove that Stephens stopped paying the expenses and deposited the money in the registry of the trial court. Frank had to prove that the charges were legitimate and that he was entitled to the money deposited with the court. Frank did not introduce any invoices he claimed were unpaid. He did not file a verified pleading, or submit any evidence, proving the elements of his suit on a sworn account. Tex.R.Civ.P. 185; *Andrews,* 885 S.W.2d at 266. In addition, we point out that the jury specifically found that Stephens had not breached the operating agreements. Frank has not attacked this finding on appeal. Thus, we conclude that the jury impliedly found against Frank on his offset defense. Accordingly, this complaint is overruled.

## ATTORNEY'S FEES

In his fifth point of error, Frank complains that there is no evidence or insufficient evidence to support the jury's award of $1.4 million in attorney's fees. He asserts that Stephens' attorney gave conflicting testimony regarding the fees incurred. In addition, Frank argues that the fees were not segregated by cause of action or by defendant. Finally, he contends that the attorney's fees are not rationally related to the amount in controversy.

As a general rule, the party seeking to recover attorney's fees carries the burden of proof. *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10 (Tex. 1991); *Aetna Cas. & Sur. v. Wild,* 944 S.W.2d 37, 40 (Tex.App.-Amarillo 1997, writ denied). Factors that a fact finder should consider when determining the reasonableness of a fee include: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Arthur Andersen & Co. v. Perry Equipment Corp.,* 945 S.W.2d 812, 818 (Tex.1997).

First, we will address Frank's challenge to the sufficiency of the evidence. His challenge rests primarily on the fact that

Stephens' attorney gave conflicting testimony about the amount of attorney's fees incurred. He also contends that the amount awarded includes fees for matters that are not related to Stephens' breach of contract claim.

The record reflects that Stephens' attorney, Jad Davis, testified to the reasonable and necessary attorney's fees attributable to the breach of contract action. First, he testified to his own background, education, and experience. He then explained the eight factors for evaluating the reasonableness and necessity of attorney's fees. *See Arthur Andersen & Co.*, 945 S.W.2d at 818. Davis made available a box of invoices and expense summaries supporting his testimony. Davis then identified the attorneys and legal assistants who worked on the case, and reviewed the work done.

Davis testified that $2,160,089.28 represented the reasonable and necessary attorney's fees and expenses "attributable to claims for which recovery of attorney's fees are allowed." He explained that the hourly rates charged to Stephens were actually below the rate he typically charged other clients. Later, Davis corrected his figure by subtracting the expenses for expert witnesses and investigators from the original amount. The new figure was $1,750,000. On cross-examination, Davis stated that the reduced figure represented the fees which potentially were recoverable. He explained that the $1,750,000 figure included $250,000 in fees that were not billed to Stephens, but could have been billed if he had charged her at his regular rate. Later, Davis was recalled and testified that the $1,750,000 figure was attributable to the fees incurred on the breach of contract claim only. During cross-examination, he stated that the fees incurred for the whole case were $3,000,000.

Frank's attorney, Greg Ackels, testified that the Casses had incurred reasonable and necessary attorney's fees of approximately $1,300,000 defending against all of the claims brought by Stephens. In addition, he stated that they had incurred expenses of $400,000. Ackels opined that the correct amount of Stephens' attorney's fees, attributable to her contract claim, was $200,000. He further stated that Stephens should not recover any attorney's fees because her claim was frivolous.

■ Obviously, the jury did not give full credit to Davis's testimony since they awarded Stephens $1.4 million instead of the requested $1.75 million. In addition, it should be equally self-evident that the jury rejected Ackels' testimony. Considering the entire record, we cannot agree that there is a lack of evidence to support the jury's award. Davis testified at length about the work done on the case. He recounted the long discovery battle and the numerous hearings held to procure documents. He opined that the defendants had engaged in a deliberate attempt to prevent Stephens from ever getting to trial. The jury was well aware that the case was eleven years old at the time of trial.

In addition, the procedural history of this case includes multiple mandamus actions, two appeals, weeks of discovery hearings, a twenty-one day hearing on the motion to suppress evidence and the motion for sanctions, a two day hearing on the motion to disqualify Eldridge, numerous pretrial motions, eight motions for summary judgment, four motions for continuance by the Casses, and a nineteen day trial. The record literally weighs in favor of Stephens' position—with over 9,000 pages of reporter's record and over 3,000 pages of clerk's record—there is more than a scintilla of evidence to support Stephens' claim. Having considered the evi-

dence in the light most favorable to the jury's verdict, we conclude that there is legally sufficient evidence to support the jury's award. Having considered all of the evidence, we conclude that there is factually sufficient evidence to support the jury's award. Accordingly, we overrule Frank's sufficiency challenges.

We pause to respond to Frank's complaint that the award includes fees and expenses incurred on matters not related to Stephens' breach of contract claim. The record does not support Frank's position. First, the jury's award does not include fees for probating General Stephens' will. Davis testified that $83 was included for securing certified copies of General Stephens' last will and testament. The copies were used to prove title during the trial. Second, the award does not include fees for litigation in Dallas County. Davis testified that he did not include any amounts for unrelated lawsuits. Specifically, Davis stated that the fees for litigation in Dallas County were not included in the written summary of the fees requested by Stephens, and Ackels agreed. Third, the award does not include fees for an alarm system or for wells and leases unrelated to this case. Davis testified that the requested fees did not include an amount for an alarm system and did not cover any unrelated wells or leases.

Davis's testimony is the only evidence concerning the fees included in Stephens' request. Frank has not brought forth any evidence that contradicts Davis's testimony. We conclude that Frank's complaints about unrelated fees are unfounded and lack merit. Frank presented his theory to the jury, and they rejected his argument. Under the facts and circumstances presented, we have no authority to interfere in the jury's resolution of the conflicts in the evidence or its assessment of the credi-

bility of the witnesses. Accordingly, we overrule his complaints.

Next, we consider Frank's complaint that the fees were not segregated by cause of action or by defendant. When a party seeks to recover attorney's fees, he must show that the fees were incurred on a claim that allows recovery of such fees and, thus, is ordinarily required to segregate fees incurred on claims allowing recovery of fees from those that do not. *Sterling*, 822 S.W.2d at 10. The party must segregate fees by claim and by defendant when there are multiple defendants which may or may not be responsible for the fees, or when there are multiple claims which may a or may not allow the recovery of such fees. *Id.* at 10–11. When the claims are "dependent upon the same set of facts or circumstances and thus are 'intertwined to the point of being inseparable,' the party suing for attorney's fees may recover the entire amount covering all claims." *Sterling*, 822 S.W.2d at 11; *Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68, 73 (Tex.1997).

Here, Davis testified that the request for attorney's fees related to Stephens' breach of contract claim only. In question number twenty-eight, the jury was asked to find the reasonable and necessary attorney's fees attributable to Frank's failure to comply with the operating agreements. Logically, Frank would be the only defendant liable for the breach of the operating agreements since the jury found that he was the operator under those agreements. As a consequence, we conclude that the fees were appropriately segregated by claim and by defendant. Accordingly, we overrule Frank's complaint.

Finally, we address Frank's contention that the attorney's fees are excessive when compared to the amount in con-

troversy. The jury found Frank liable for $586,162.17 in damages on Stephens' breach of contract claim. Frank argues that the amount of attorney's fees are more than twice the amount of the damages and, thus, they are excessive. We disagree. Considering the facts and circumstances of this case, we conclude that the attorney's fees are reasonable and necessary. This case has been in litigation for fourteen years. The record is long and detailed. The discovery process was exhaustive and caused Stephens to spend large amounts just to obtain the documents and information that support her claim. There is nothing simple about this case and the parties have fought over every point imaginable. We conclude that the jury's award is not excessive. Consequently, we overrule Frank's fifth point of error.

## EXEMPLARY DAMAGES

During the punitive damage stage of trial, the jury awarded Stephens $5 million for Frank's fraudulent actions, $15 million for Frank's malicious conversion, and $20 million for Michael's malicious conversion. Stephens voluntarily remitted $2.5 million of the award for Frank's fraud, $12.5 million for Frank's malicious conversion, and $17.5 million for Michael's malicious conversion. On appeal, Frank attacks the legal and factual sufficiency of the evidence to support the jury's fraud finding. Frank and Michael also attack the sufficiency of the evidence to support the jury's malice findings. They also complain that the jury's awards were excessive. We will consider the sufficiency challenges and then the excessiveness complaints.

### Sufficiency of the Evidence

First, Frank asserts that there can be no award of punitive damages without a finding that he intentionally committed fraud against Stephens. He argues that there is no evidence or insufficient evidence to support a finding that he intentionally committed fraud. *See Sears, Roebuck & Co. v. Meadows,* 877 S.W.2d 281, 282 (Tex.1994)(intent to defraud is a necessary element of a fraud claim); *Bennett v. Howard,* 141 Tex. 101, 170 S.W.2d 709, 712 (1943) (exemplary damages are recoverable for fraud). Because we have already determined that there is both legally and factually sufficient evidence to support the jury's finding of fraud against Frank, we overrule his complaint.

Second, Frank and Michael contend that there is no evidence or insufficient evidence to support the jury's findings that they maliciously converted Stephens' property. A party may recover exemplary damages when it proves that property was converted with malice. *See George Thomas Homes, Inc. v. Southwest Tension Systems, Inc.* 763 S.W.2d 797, 800 (Tex.App.-El Paso 1988, no writ). Malice may be shown by proof of either actual malice or implied malice. *Id.* Actual malice is characterized by ill-will, spite, evil motive, or purposing the injuring of another. Implied or legal malice, on the other hand, exists when wrongful conduct is intentional and without just cause or excuse. *See Continental Coffee Products Co. v. Cazarez,* 937 S.W.2d 444, 452 (Tex.1996). Because this action was filed on November 4, 1986, we will not apply the heightened clear and convincing evidence standard when we review the factual sufficiency of the evidence to support the malice findings. *See Moriel,* 879 S.W.2d at 31–2 (declining to adopt clear and convincing evidence standard); Act of April 26, 1995, 74th Leg., R.S., ch. 19, §§ 1–2, 1995 Tex. Gen.Laws 108–113 (adopting clear and convincing evidence standard for cases filed on or after September 1, 1995; current version at Tex.Civ.Prac. & Rem.Code

Ann. § 41.001(2), § 41.003 (Vernon 1997)). The standard for reviewing a legal sufficiency challenge remains unchanged whether we apply a heightened burden of proof or not. *See In re B.R.*, 950 S.W.2d at 119.

■ The evidence clearly shows that Frank and Michael converted jointly-owned equipment for their own use and benefit. The evidence also shows that they converted the equipment with actual malice. First, there is the evidence that the Casses attempted to conceal their bad acts. Eldridge testified that the accounting procedures began to disintegrate after the General terminated his partnership with Frank. He also related that the Casses failed to provide the Gruy auditors with many of the documents which disclosed the unauthorized equipment transfers and the gross overbilling of the joint accounts for equipment the joint owners already owned or for equipment they never received. The evidence shows that Frank attempted to destroy many of the documents that traced the equipment transfers and bogus charges by throwing them in the trash. Eldridge testified that without the documents, he would not have been able to reconstruct many of the transfers and charges. The trash documents included original copies of operating agreements, handwritten notes by Frank and Michael concerning the transfers and bogus charges, and invoices and transfer orders signed by both men. Second, there is the evidence that Frank and Michael later sold their interests in the Cass companion wells to a third party for $12 million. Third, there is the evidence that they generally resisted and attempted to delay trial of this case for approximately ten years.

The jury was free to infer malicious intent from the facts and circumstances presented. It was certainly reasonable for the jury to infer that the numerous: failures to give credit; the double billings for equipment already owned; and the billings for equipment and expenses never used by the joint interest owners, was not just fortuitous or accidental. The jury reasonably could have inferred that Frank and Michael deliberately and intentionally acted to benefit their own interests at the expense and detriment of the joint interest owners. As a consequence, we conclude that there is legally sufficient evidence to support the malice findings.

■ Next, we address Michael's complaint that Eldridge was not competent to give expert opinions regarding malice. He asserts that Eldridge's testimony is the only evidence supporting the malice findings. He argues that Eldridge's testimony was not supported by any evidence and that Eldridge was not qualified to give an opinion regarding whether the Casses defrauded, cheated, or stole from the joint interest owners. We disagree. First, Eldridge's testimony is not the only evidence supporting the malice findings. The record reflects that numerous documents were admitted into evidence, showing the transfer of equipment without credits and the bogus charges made to the joint accounts.[5] Second, this evidence clearly is the basis for Eldridge's report and his testimony. Third, Eldridge was clearly qualified to give an opinion regarding whether the Casses intentionally converted the joint interest owners's equipment. Eldridge was competent to opine about the accounting procedures employed, and the actual accountings made, by the Casses.

---

**5.** Plaintiff's Exhibits 1202A–1202TTT and 1219A–C, are not a part of the record. These exhibits consist of many of the invoices, material transfer orders, and other documents which back up Eldridge's conclusions.

He reviewed transfer orders signed by both Frank and Michael, the handwritten notes of both men, and was well aware of the role Michael played in the business. Eldridge's opinion that Frank and Michael intentionally defrauded, cheated, and stole from the joint interest owners is supported by evidence and is certainly a reasonable inference to be drawn from the evidence presented. We overrule Michael's complaint.

Finally, we address the factual sufficiency of the evidence. Frank relies on the evidence: that he sometimes paid vendors with his own money when the joint interest owners were late paying their bills; that he waited patiently for three years for the joint interest owners to elect a new operator; that he procured a new operator when the joint interest owners would not; and that the operating agreements authorized him to move the joint equipment between the jointly-owned wells. He argues this evidence proves his lack of malice. This evidence was presented to the jury and they impliedly rejected Frank's version of the events. Having considered all of the evidence, we conclude that the jury's verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong or manifestly unjust. Frank's complaint is overruled.

Michael relies on the evidence that the JOAs authorized the movement of the equipment. He also asserts the evidence shows that he was just following his father's orders and was unaware of the accounting errors. Again, this evidence was presented to the jury and was rejected. There is evidence which shows that Michael was intimately involved in the daily affairs of Cass Oil Company, Inc. For a period of time, he served as field supervisor. When he returned to Dallas, he was involved in allocating expenses between wells. His name appears on transfer orders and invoices. Considering all of the evidence, the jury was free to infer that Michael did more than just follow his father's orders. We again note that the operating agreements only authorized the operator to purchase jointly-owned equipment; there was no authorization for the equipment to be taken without compensation. We conclude that there is factually sufficient evidence to support the malice finding. Michael's complaint is overruled.

### Excessiveness

Frank and Michael complain that the jury's awards are excessive under Texas and federal law. Specifically, they argue that the punitive damage awards are not rationally related to the actual damages. They assert that the awards are the product of passion and prejudice, and violate substantive due process protections against excessive punitive damage awards.

We disagreed in our original opinion and affirmed the punitive damage award. The Texas Supreme Court denied Appellants' Petition for Review, but *Certiorari* was granted by the U.S. Supreme Court. Our original opinion was vacated and remanded to us for reconsideration in light of the Court's decision in *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). *Campbell* held that the award of excessive punitive damages in that case violated the Due Process Clause.

In this case, the punitive damage to compensatory damage ratios are approximately twenty-five to one. The jury assessed $101,300.92 against Frank as damages for his fraudulent conduct, and $98,780.82 against Frank and Michael jointly and severally as damages for their malicious conversion. After remittitur, the punitive damage awards are $2.5 million per defendant per each cause of action.

The evidence regarding the nature of the wrong and the character of the conduct involved has already been thoroughly discussed. Stephens presented evidence that Frank defrauded the joint interest owners and converted their equipment for his own personal gain. The evidence also shows that Michael participated, aided, and abetted his father in defrauding the joint interest owners and converting their equipment. Culpability for these actions can lie nowhere but with Frank and Michael. Regarding the sensibilities of the parties concerned, Frank ran a corporation which handled $30 million of business during the two-year Gruy audit period, whereas Stephens was a housewife unacquainted with the oil and gas business. Stephens produced evidence that General Stephens was unable to handle his financial affairs during the years after he terminated his partnership with Frank. Eldridge testified that the accounting procedures began to decline after the partnership terminated. He concluded that Frank and Michael had attempted to take advantage of the General and Mrs. Stephens by systematically inflating the joint interest billings, by making fraudulent expense charges, and by converting the jointly-owned equipment.

The Supreme Court continues to follow the benchmarks it earlier established in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) for determining whether a punitive damages award is unconstitutionally excessive: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between actual and punitive damages; and (3) a comparison of the punitive damages awarded and other civil or criminal penalties that could be imposed for similar misconduct. *See Campbell*, 123 S.Ct. at 1515; *BMW*, 517 U.S. at 574–75, 116 S.Ct. at 1598–99; *see also, TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 462, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993); *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 20–21, 111 S.Ct. 1032, 1043–44, 113 L.Ed.2d 1 (1991).

We continue to believe the acts of the defendants in this case constitute such reprehensibility as to warrant the imposition of further sanctions. The facts found by the jury show that Frank and Michael intentionally and deliberately defrauded and converted the property of the joint interest owners for their own personal benefit. Fraud and conversion are ancient wrongs which are roundly denounced and receive little public sympathy. Here, the facts are egregious and show a deliberate attempt by both men to escape responsibility for their wrongful conduct. Considering the reprehensibility of the conduct and the ratios together, we conclude that the jury's punitive awards are not unreasonable. We do note, however, that the harm suffered by the plaintiffs was economic rather than physical which would be a militating factor in the award of punitive damages. *Campbell*, 123 S.Ct. at 1516.

Turning then to the second guidepost of relationship between the harm and the punitive damages award, *Campbell*, while eschewing any "bright-line tests," does seem to establish a single digit multiple range when it states that in most cases due process will be violated if the punitive award is more than nine times the amount of the compensatory award. *Campbell*, 123 S.Ct. at 1524. Furthermore, when the compensatory damages are substantial, then a lesser ratio could "reach the outermost limit of the due process guarantee." *Id.* at 1516.

We now consider the last *BMW* factor, the sanctions for comparable misconduct. First, we observe that the criminal law punishes the theft of property, in the amounts converted here, as a third-degree felony. *See* Tex.Pen.Code Ann.

§ 31.03(e)(5)(Vernon Supp.2004–05)(theft of over $20,000 but under $100,000). In Texas, a third-degree felony is punishable by a jail sentence of not more than 10 years or less than 2 years and a possible fine of up to $10,000. *See* Tex.Pen.Code Ann. § 12.34 (Vernon 2003).

■ Taking all relevant considerations into account, we conclude that the punitive damages award to plaintiffs exceeds the amount tolerable under the Due Process Clause. We further conclude that because there were sizable economic damages and other sanctions noted below that the circumstances and context of this case do not merit a ratio that exceeds four to one. Ergo, we find that a ratio of punitive to compensatory damages of three to one is constitutionally permissible.

The jury assessed compensatory damages of $101,300.92 against Frank and $98,780.82 against Frank and Michael jointly and severally. An appropriate amount of punitives against Frank individually is $300,000, and against Frank and Michael jointly and severally is $300,000. We find it only necessary to review the federal claim because it is dispositive. Issue three is sustained.

## SANCTIONS

In his sixth point of error, Frank complains that the trial court abused its discretion by imposing sanctions against him. The trial court awarded Stephens $978,492.10 as damages for Frank's discovery abuses. The trial court's judgment includes eighteen findings regarding the abuses by Frank and the justness of the trial court's award. On appeal, Frank complains that the award does not comport with the standards set by the Supreme Court. *See TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 917 (Tex. 1991); *Braden v. Downey,* 811 S.W.2d 922 (Tex.1991). Specifically, he argues that the award is unjust and excessive.

■ A trial court may impose sanctions on any party that abuses the discovery process. *See* Tex.R.Civ.P. 215. The discovery sanctions imposed by a trial court are within that court's discretion and will be set aside only if the court clearly abused its discretion. *Bodnow Corp. v. City of Hondo,* 721 S.W.2d 839, 840 (Tex. 1986). The sanctions imposed must be just. *Powell,* 811 S.W.2d at 917. To determine whether an imposition of sanction is just, we consider whether: (1) there is a direct relationship between the offensive conduct and the sanction imposed; and (2) whether the sanction is excessive. *Id.* A trial court abuses its discretion if the sanction it imposes does not further one of the purposes that discovery sanctions were intended to further. *Bodnow Corp.,* 721 S.W.2d at 840; *Cap Rock Elec. Cooperative, Inc. v. Texas Utilities Elec. Co.,* 874 S.W.2d 92, 99–100 (Tex.App.-El Paso 1994, no writ).

■ Frank asserts that the trial court abused its discretion by awarding unjust and excessive sanctions, however, he has not attacked any of the trial court's findings of fact. The judge's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them, by the same standards which are applied in reviewing the legal or factual sufficiency of the evidence to support jury findings. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex.1991); *Cap Rock Elec.Cooperative, Inc.,* 874 S.W.2d at 97. By failing to attack the trial court's findings, Frank has waived any complaint regarding the sufficiency of the evidence to support those findings. *Simon v. Watson,* 539 S.W.2d 951, 959 (Tex.Civ.App.-Waco 1976, writ ref'd n.r.e.). Accepting the trial court's findings as true and correct, we now consider Frank's complaint.

■ The record contains over 4,000 pages of reporter's record dedicated to the numerous hearings on Stephens' motion for sanctions. Over the course of thirteen months, the trial court heard several weeks of testimony from more than eighty witnesses regarding Frank's discovery abuses. In its final judgment, the trial court specifically found that Frank: (1) abused the discovery process; (2) failed to comply with discovery requests; (3) violated the court's discovery orders; and (4) systematically destroyed relevant files and records. The court then noted that it had tested less stringent sanctions against Frank, and that less stringent sanctions would not be effective in this case. The court also found that Frank's discovery abuses created an onerous burden to the court, and that Frank exhibited flagrant bad faith and callous disregard for his responsibilities under the rules of procedure. The trial court's judgment shows that it considered both *TransAmerican Natural Gas Corp.* and *Braden* when it imposed the sanctions.

Frank contends that his conduct did not prejudice Stephens. First, he asserts that Stephens already had copies of the trash documents, and that the documents were produced to the Gruy auditors. We disagree. One, there is no proof that Stephens had a copy of the documents that were thrown away. Two, Stephens put on evidence showing that the trash documents were not produced to Gruy. Next, Frank asserts that Stephens was not prejudiced because the General agreed that the records could be destroyed.[6] We disagree. First, we point out that the trash documents were covered by a discovery order regardless of whether the General agreed

to destroy an extra set of those documents. Second, we note that the operating agreements required the operator to maintain a copy of the joint account records. Thus, Frank had a duty as operator to maintain a copy of the records regarding the joint accounts regardless of the agreed destruction of the documents held in storage.

Finally, Frank complains that the sanctions create a double recovery because the award includes damages attributable to attorney's fees. We disagree. Mr. Davis testified that the reasonable and necessary attorney's fees for the whole case were $3 million. The jury awarded Stephens $1.4 million for the breach of contract claim alone. Considering the numerous motions, the numerous hearings on Stephens' discovery requests, the weeks of hearings on the motion for sanctions, and the appeal of the sanctions order, we conclude that the award of attorney's fees was just.

In summary, we conclude that the trial court did not abuse its discretion by imposing sanctions. The evidence shows that Frank failed to comply with Stephens' discovery requests, that he violated the court's discovery orders, and that he destroyed discoverable documents and records. The record also contains evidence that Stephens incurred considerable expenses in recovering the trash documents and in pursuing Frank's compliance with the rules of procedure. We conclude that the sanctions were just as both a punishment for Frank's bad faith conduct and as a future deterrent against such conduct. The sanctions were directly related to the offensive conduct and were not excessive considering the time, effort, and expense incurred by Stephens. Accordingly, we overrule Frank's sixth point of error.

---

6. The record includes a letter signed by the General and Frank, wherein they authorized Security Archives, Inc., to destroy a number of boxes of documents which the company had in its possession. Frank testified that he and the General each had their own copies of the documents that were to be destroyed.

## CONCLUSION

In summary, we conclude that the trial court did not err by admitting Eldridge's testimony or by imposing sanctions. Further, we conclude that there is legally and factually sufficient evidence to support the jury findings except for punitive damages. We affirm the judgment of the trial court except that we reform the judgment to provide for punitive damages of $300,000 against defendant Frank Cass, and $300,000 against defendants Frank Cass and Michael Cass.