Affirmed and Opinion filed June 28, 2007








Affirmed and Opinion filed June 28, 2007.

 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-05-01099-CV

_______________

 

EUGENE MORRIS HARTIS JR., Appellant

 

V.

 

CENTURY FURNITURE INDUSTRIES, INC., Appellee

                                                                                                                                               


On Appeal from the 55th District Court

 Harris County, Texas

Trial Court Cause No. 04-32785

                                                                                                                                               


 

O P I N I O N








Appellant Eugene Morris Hartis, Jr.
sold furniture on consignment for appellee, Century Furniture Industries, Inc. 
After Hartis repeatedly failed to remit payment to Century, the parties agreed
that Century would pick up its consigned furniture and also furniture
manufactured by third parties from Hartis=s Houston warehouses and credit the
value of the furniture to Hartis=s outstanding indebtedness.  After
retrieving and reselling the furniture, Century brought suit on a sworn
account, alleging that, after applying the credit to Hartis=s account, an outstanding balance
remained.  As an affirmative defense and counterclaim, Hartis alleged that the
transfer was performed subject to a new contract under which Century agreed to
pay the full price stated by Hartis for each item.  The main dispute on appeal
involves Hartis=s contention that Century agreed to purchase each item of
third-party furniture for the price stated by Hartis in a written document
detailing his Houston inventory.  After a trial to the bench, the trial court
ruled in favor of Century.  We affirm the trial court=s judgment.

I.  Factual
and Procedural Background

April 2002BFebruary 2003

Appellant Eugene Hartis, Jr. was a
manufacturer=s representative for Century Furniture Industries, Inc. (ACentury@).  His company, Century Showrooms (AShowroom@) maintained an open account with
Century.  Century consigned furniture to Showroom, and Showroom paid Century
for the furniture after it was sold.[1]  

Century=s controller, Brandon Hucks,
inventoried Showroom=s three warehouses in April 2002 and discovered that,
although Century had consigned furniture with a wholesale value of $454,930.89
to Showroom, Showroom had only $229,724.25 in consigned furniture in its
possession.  Hartis admitted that he had sold the missing furniture and had not
remitted any of the proceeds to Century.[2]









In an effort to address the missing
payments, Hartis executed a AKey Points of Agreement@ (AKey Agreement@) with Century on April 29, 2002. 
Under this Agreement, Hartis assumed personal responsibility for Showroom=s debt (the ANote@) and agreed to execute required
forms perfecting Century=s lien on Athe existing inventory and inventory acquired in the future@ as collateral securing the Note.  He
also agreed that, effective January 1, 2003, he would devote 85% of Showroom=s net usable space to Century
products.  Century agreed to reduce the debt arising from the missing furniture
from $225,206.64 to $150,000, and the parties established a payment plan. 
Hartis agreed to pay Century $50,000 of this debt on May 15, 2002 and to pay
the remainder in four quarterly installments of $25,000 each, beginning on
August 1, 2002.  Hartis made the first two payments totaling $75,000, but
failed to make payments due on November 1, 2002 and February 1, 2003.  

By February 2003, Hartis had reported
additional sales of Century=s consigned furniture with a wholesale value of $135,173.25.[3] 
After deducting these reported sales from Hartis=s April 2002 inventory, Century
expected that in February 2003, Hartis possessed Century furniture with a
wholesale value of $94,551.00.  Hartis also incurred additional debts to
Century during this time.  As a result of sales on other accounts and sales of
floor samples, Hartis=s total debt to Century in February 2003, including payments
due under the Key Agreement, totaled $256,432.03.  

February 12, 2003BMarch 17, 2003

Hucks testified that Hartis offered
to pay his outstanding debt by turning over merchandise listed in three
inventory spreadsheets that Hartis emailed to Hucks on February 12, 2003.  One
spreadsheet listed merchandise stored in Dallas and identified with the Durango
Trading Company (the ADurango Inventory File@); another listed imported goods
stored in a warehouse in High Point (the AHigh Point Inventory File@).[4] 
The third spreadsheet was identified as ACentury 2003 Reconciliation, Item
Listing, February 12, 2003@ (the AHouston Inventory File@).  The Houston Inventory File
contains six columns with the headings, AItem,@ ADescription,@ AQuantity on Hand,@ ACost,@ AExt Cost,@ and APreferred Vendor.@  On the last page of this
spreadsheet, the sum of the entries in the column marked AExt Cost@ is listed as $386,503.54.








On February 17, 2003, Hartis emailed
Century two files labeled ACSR Inventory Reconciliation021803@ and ADurango Inventory021803.@  The body of the email contains no
text, but the stated subject is AUpdated Inventory.@  

On February 18, 2003, Hucks wrote to
Hartis as follows: 

Gene, I haven=t had an opportunity to review the
detail of your files below, but the CSR file seems high.  When I took you=re [sic] Dec. Inventory less January
Sales, I came up with 296,529.20. (excluding Durango and High Point).  That
seemed reasonable based on the January sales figures that we discussed
(approximately $150K to $160K with little to no margin).  Your file below
states 366,887.09.  Any ideas?  

On February 20, 2003, Hartis
responded: 

I was trying to get a picture of the
Century inventory and left the subtotal in the figures.  I think that the
Century inventory was added in twice.  I am forwarding a corrected copy that
subtotals the Century inventory and then backs out the Century
goods. . . . Also attached is a listing of the Century
items cleared in Jan/Feb.  The merchandise at Ampac in High Point does not
belong to [Showroom]. . . . There is also additional
merchandise at Ampac from the Chinese company that came in with the goods
designated for me.  We do not own any of it, however.  

Sometime between February 20 and
March 17, 2003, Century picked up five truckloads of consigned and third-party
furniture from Hartis=s warehouses.  

Transfer of Consigned Furniture








The parties do not dispute their
mutual understanding that some of the transferred furniture was held on
consignment, or that, after retrieving the consigned furniture, Century removed
it from the list of consigned items held in trust, effectively giving Hartis a Adollar-for-dollar@ credit for these items.  The initial
wholesale cost of these goods, and thus the credit applied to Hartis=s debt upon their return, totals
$64,784.75.[5]  With the
exception of items that were simply misidentified on the party=s listsCand Hartis testified at trial that
these constitute an insignificant amountCthe shortfall is the result of
missing inventory.  When asked at trial if he sold an additional $30,000 of
consigned Century furniture and again failed to pay Century, Hartis responded, APossibly.@

Transfer of Third-Party Furniture

The remainder of the furniture
transferred to Century consisted of furniture manufactured by third parties. 
The third-party furniture was not in its original packaging and had previously
been displayed; Hartis was unsure of its age.  Century sold this furniture to
its sister company, Boulevard, for an amount Century identified as market
value.  

On March 17, 2003, Hucks emailed
Hartis as follows:

Gene, Please see the attached file
per our conversation.  The first tab contains a recap of your
liability.  The second tab contains a Asummary@ of the inventory picked up.  The third
tab contains the Adetail@ of the inventory picked up.  The fourth tab contains
the remaining consignment inventory prior to the pick-up.  Per our
conversation, let=s discuss further on Friday.

One or more of the files attached to
the email contained the information that, as a result of the transfer of the
third-party goods, Century had applied a credit of $68,911.00 to Hartis=s outstanding debt.  This amount
represented 40% of the price Hartis listed for the items in the Houston
Inventory File attached to his email of February 12, 2003; according to the
evidence presented at trial, this is also the amount for which Century sold the
property to Boulevard.  Century credited this amount to Hartis=s debt, leaving an outstanding
balance of $105,013.27.  Hartis made no further payments, and there is no
evidence of any further written communications.

The Trial

Century brought suit on a sworn
account against Hartis, adding claims for quantum meruit, breach of contract,
fraud, and conversion.  Hartis asserted a counterclaim for breach of contract,
and the case was tried to the bench on June 16, 2005.  








At trial, Hucks testified that he and
Hartis had agreed that the market price for the third-party goods would be
applied to Hartis=s outstanding debt (i.e., the debt that Hartis owed Century
under the Key Agreement and the debt that his company owed Century for
consigned goods).  Hucks further testified that in North Carolina, where
Century is headquartered, liquidation prices are 40B50% of the wholesale price, and when
sold through a retailer, the market value for furniture is 50B60% of the wholesale price.[6] 
These prices apply to goods out of the box on the showroom floor.  Here, the
transferred goods were wrapped in blankets, and Hartis admitted that the goods
were out of the box and had been on display.

Hartis admitted that he did not
comply with the terms in the Key Agreement requiring him to give Century liens
on the existing and future inventory.  Initially, he also testified that he
never had any discussions with Century concerning discounts to the price he
identified for the third-party goods.  Although he subsequently testified that
Century offered to take the goods at market price, Hartis stated that he
refused the offer. 

According to Hartis, he instructed
Century to examine the goods in Houston and accept only those that it
considered salable.  He admitted that he knew Century would sell the goods to
its sister company, but testified that he could have liquidated the third-party
goods for a 33B40% profit.  In contrast, Century produced evidence that in November 2002,
Hartis=s company was selling furniture at a
50B80% reduction from retail prices. 
Most of the items listed in Hartis=s inventory of February 12, 2003
would have been among those items offered for sale at reduced prices in
November 2002. 

During closing argument, Hartis
argued that the case was governed by Article 2 of the Uniform Commercial Code. 
After the trial court requested post-trial briefing on the issue, Century
objected on the grounds that Athe UCC argument is not made in the pleading.@  The trial court suggested that
Century address this objection in its post-trial brief.








On June 21, 2005, Century moved to
reopen the evidence in order to introduce a security agreement, a UCC financing
statement, and evidence regarding the date on which Century sold the
third-party furniture to Boulevard.  Hartis opposed the motion, and the trial
court denied it.  On June 22, 2005, Hartis moved Afor a trial amendment to incorporate
Article 2 into his contract pleadings.@  This motion also was denied.

On July 22, 2005, the trial court
entered its final judgment in favor of Century and ordered Hartis to pay the
principal sum of $105,103.27 plus prejudgment and postjudgment interest and
reasonable attorneys= fees.[7]  Hartis
requested findings of fact and conclusions of law, and after he filed a notice
that they were past due, the trial court issued its findings and conclusions on
October 4, 2005.  In pertinent part, the trial court wrote as follows:

Century pleaded and proved a sworn account by which
Hartis had acquired from Century furniture to be sold in his retail furniture
store.  Century proved that the amount due, owing and unpaid on that account
was $30,013.27.

 

The court=s
holding on Century=s sworn-account claim mooted Century=s quantum meruit claim.  Century either
abandoned or failed to bear its burden to prove Hartis=[s] liability for fraud and conversion.

 

The agreement at issue in Century=s breach-of-contract claim was the Key Points of
Agreement signed by Hartis and Century on April 29, 2002.  As one of the terms
of that agreement, Hartis agreed to payCand
Century agreed to acceptC$150,000 for Asold@ inventory that had been worth $225,000.  By paying
only half of the $150,000 he had agreed to pay, Hartis breached the
agreement. . . . The court holds that Hartis is liable for the
$75,000 he failed to pay, but that the $75,000 Adiscount@ does not constitute damages arising out of a breach
of the contract.  Accordingly, Century=s
recovery on its breach-of-contract claim is limited to $75,000.

 

Hartis=[s]
counterclaim for breach of contract fails both because he failed to bear his
burden to prove the existence of a valid agreement and because any such
agreement would have been unenforceable under the Statute of FraudsCTex. Bus. & Com. Code
Ann. '
2.201Cwhich Century asserted and proved as an affirmative
defense.








The trial court denied Hartis=s motions for additional findings and
for a new trial, and this appeal ensued.

II.  Issues
Presented 

Hartis presents eleven issues for our
review.  In his first issue, Hartis contends the trial court improperly
required him to prove the existence and terms of an agreement between the
parties concerning the third-party goods transferred to Century in February
2003.  He next argues that the trial court should have found, as a matter of
law, that there was an agreement between the parties to credit Hartis for the
third-party goods that Century obtained from him in February 2003;
alternatively, he contends that the trial court=s failure to make such a finding is
against the great weight and preponderance of the evidence.  Hartis argues in
his third issue that the trial court should have found, as a matter of law, that
the agreed price for each third-party item was the price listed in the Houston
Inventory File he emailed to Century on February 12, 2003; alternatively,
Hartis contends that the trial court=s failure to make such a finding is
against the great weight and preponderance of the evidence.  

Hartis raises additional sufficiency
challenges in his fourth, fifth and sixth issues.  In his fourth issue Hartis
asserts that there is legally and factually insufficient evidence to support
the trial court=s implied finding that the parties agreed Century would
credit Hartis for the market price of the third-party goods.  Hartis argues in
his fifth issue that the evidence is legally and factually insufficient to
support the trial court=s implied finding that the market price for these goods was
forty percent of the price listed in the Houston Inventory File.  In his sixth
issue, Hartis contends the trial court should have found, as a matter of law,
that the market price for the third-party goods was the price listed in the
Houston Inventory File; alternatively, he argues that the failure to make such
a finding was against the great weight and preponderance of the evidence.  








Hartis asserts in his seventh issue
that the trial court should have excluded the testimony of Brandon Hucks
concerning the market price for the goods transferred to Century in February
2003 because Hucks was not designated as an expert.  In his eighth issue,
Hartis challenges the trial court=s holding that his counterclaim was
barred by the statute of frauds.  Hartis contends in his ninth issue that the
trial court should have conducted a new trial because Century failed to produce
a controlling document in discovery.  In his tenth issue, Hartis argues that
the trial court should have held Century=s failure to sell the goods in a
manner complying with Article 9 of the Uniform Commercial Code disqualified
Century from recovering a deficiency from him.  Finally, in his eleventh issue,
Hartis challenges the trial court=s award of attorneys= fees.

III.  Analysis

A.        Burden of Proof 

Hartis asserts in his first issue
that the trial court improperly placed the burden on him to prove the existence
and terms of an agreement between the parties concerning the goods picked up by
Century in February 2003.  We disagree.  Hartis pleaded payment as an
affirmative defense to Century=s suit on a sworn account; thus, he bore the burden to prove
this defense.  See Tex. R. Civ.
P. 94, 95; Sw. Fire & Cas. Co. v. Larue, 367 S.W.2d 162, 163
(Tex. 1963).  Moreover, not only is his assertion of payment a matter in
avoidance, but Hartis also pleaded breach of contract as a counterclaim, and
bears the burden of proof on his own claims.  








In support of his argument that the
trial court improperly shifted the burden of proof, Hartis relies on Willis
v. Jenkins.  472 S.W.2d 600, 602 (Tex. Civ. App.CTyler 1971, no writ).  In Willis,
the Twelfth Court of Appeals observed the unexceptional rule that a defendant
bears the burden of proof on his counterclaim.  Id.  Thus, it undermines
rather than supports Hartis=s argument.  He also relies on Olney Savings & Loan
Association v. Farmers Market of Odessa, Inc.  764 S.W.2d 869, 871 (Tex.
App.CEl Paso 1989, writ denied).  There,
the Eighth Court of Appeals held that in a suit by a lender for a deficiency
judgment from loan guarantors after a non-judicial foreclosure sale, the
lender, by alleging that it sold the property for a Afair and reasonable@ value, assumed the burden of proof
on that issue.   Id.  But Olney does not purport to apply outside
of the real property context.[8]  

Finding no support for Hartis=s arguments, we conclude the trial
court properly placed the burden of proof; thus, we overrule his first issue.

B.        The
Transfer as a Separate Agreement

In his second, third, and eighth
issues, Hartis essentially complains of the following conclusion of law:

Hartis=[s] counterclaim for breach of
contract fails both because he failed to bear his burden to prove the existence
of a valid agreement and because any such agreement would be unenforceable
under the Statute of FraudsCTex. Bus. & Com. Code Ann. ' 2.201Cwhich Century asserted and proved as
an affirmative defense.

We begin our analysis with Section
2.201 of the Business and Commerce Code, which provides as follows:

(a)  Except as otherwise provided in this section a
contract for the sale of goods for the price of $500 or more is not
enforceable by way of action or defense unless there is some writing sufficient
to indicate that a contract for sale has been made between the parties and
signed by the party against whom enforcement is sought or by his authorized
agent or broker.  A writing is not insufficient because it omits or incorrectly
states a term agreed upon but the contract is not enforceable under this
paragraph beyond the quantity of goods shown in such writing.

 

 








(b)  Between merchants if within a reasonable time a
writing in confirmation of the contract and sufficient against
the sender is received and the party receiving it has reason to know its
contents, it satisfies the requirements of Subsection (a) against such party unless
written notice of objection to its contents is given within ten days after it
is received.

(c)  A contract which does not satisfy the
requirements of Subsection (a) but which is valid in other respects is
enforceable . . .

. . .

(2)       if the party against whom enforcement is
sought admits in his pleading, testimony or otherwise in court that a contract
for sale was made, but the contract is not enforceable under this provision
beyond the quantity of goods admitted; or

(3)       with
respect to goods for which payment has been made and accepted or which have been received and accepted (Section 2.606).

Tex. Bus.
& Com. Code Ann. ' 2.201 (Vernon 1994) (emphasis
added). 

Contrary to Hartis=s contentions, the exchange of emails
in February and March 2003 does  not constitute a writing satisfying the
requirements described in section 2.201(a) of the Business and Commerce Code. 
It is undisputed that, under the terms of the Key Agreement, Hartis had already
pledged his present and future inventory as collateral securing the Note and
agreed to perfect Century=s lien on the inventory.  It is also undisputed that, at the
time the furniture was transferred, Hartis had defaulted on the Note.  Nothing
in the exchanged emails indicates the parties intended to modify their
agreement or execute a new and separate contract, particularly since the
transfer of these goods to Century in the event of Hartis=s default was already encompassed
within the Key Agreement.  Moreover, none of the writings contain an offer or
agreement that Century would pay Hartis the amount listed in the Houston
Inventory File for each third-party item or credit that amount against Hartis=s outstanding debt.  








Hartis also contends that, taken
individually or collectively, the Houston Inventory File, the February 18, 2003
email from Hucks to Hartis, and a file entitled AHouston Inventory, 3rd Party
Inventory Picked-Up@ constitute a Aconfirmatory memoranda.@  He then relies on section 2.202 of
the Business and Commerce Code to argue that parol evidence can be used to
explain variances in the quantities of transferred goods, but not to vary the
price from that stated in the Houston Inventory File.  

The statute at issue provides in
pertinent part:

Terms with respect to which the confirmatory memoranda
of the parties agree or which are otherwise set forth in a writing intended
by the parties as a final expression of their agreement with respect to
such terms as are included therein may not be contradicted by evidence of any
prior agreement or of a contemporaneous oral agreement but may be explained or
supplemented

(1)       by course of performance, course of dealing,
or usage of trade (Section 1.303); and

(2)       by evidence of consistent additional terms
unless the court finds the writing to have been intended also as a complete and
exclusive statement of the terms of the agreement.

 

Tex. Bus.
& Com. Code Ann. ' 2.202 (Vernon Supp. 2006) (emphasis
added).  








Examining the writings at issue, a
reasonable factfinder could conclude that Hartis failed to show the series of
emails and attachments were intended as a final expression of the parties= agreement.[9] 
First, Hartis=s email of February 12, 2003 is not sufficiently specific to constitute
an offer.  Although it attached the Houston Inventory File, the Key Agreement
already required inventories to be performed monthly.[10] 
Moreover, the email and attachment could not be reasonably construed as an
offer for sale because Century already owned the majority of Century products
included on the list.  Most of the Century furniture was held on consignment,
and although Century had the right to retrieve these goods at any time if the
terms of the Key Agreement were not satisfied, Hartis=s email and attachment did not treat
these items differently from the third-party goods owned by Hartis or
Showroom.  Finally, we note that the Key Agreement required Hartis to maintain
a volume of Century goods constituting Ano less than 85% of the net usable
space by January 1, 2003@ and that his progress toward that target was to be reviewed
quarterly.  On its face, the Houston Inventory file and the inventory
reconciliations appear to respond to this requirement.  Similarly, Hucks=s email to Hartis on February 18,
2003 and Hartis=s response on February 20, 2003 can reasonably be
characterized as a discussion concerning Hartis=s compliance with the Key Points of
Agreement, both by accurately reporting sales and by maintaining Century=s inventory prominence. 

In sum, there is no evidence that the
communications on which Hartis relies confirm a new contract, rather than
addressing an offset to a preexisting debt; thus, sections 2.201(b),
2.201(c)(2), and 2.203 of the Uniform Commercial Code are inapplicable.  See
id. '' 2.201(b), (c)(2), 2.202.  For
similar reasons, there is no evidence of an agreement that is Avalid in other respects,@ and thus section 2.201(c)(3) does
not apply.  See id. ' 2.201(c)(3).  We therefore overrule Hartis=s second, third, and eighth issues.

C.        Implicit
Finding that the Parties Agreed to Apply a Credit Against Hartis=s Debt in the Amount of the Market Price
for the Third-Party Furniture








Hartis=s fourth and fifth issues concern the
legal and factual sufficiency of the evidence supporting the trial court=s implied findings.[11] 
In his fourth issue, Hartis challenges the implied finding that the Aparties= agreement was that the price to be
paid, or credited against what Hartis owed Century, for the goods picked up by
Century from Hartis=[s] warehouse in February[] 2003 was to be market price, in
that such finding was supported by no evidence, or alternatively, by
insufficient evidence.@  In his fifth issue, Hartis argues that the Atrial court should not have
implicitly found that the market price for the goods picked up by Century from
Hartis=[s] warehouse in February[] 2003 was
40% of Hartis=[s] stated price, in that such finding was supported by no evidence, or
alternatively, by insufficient evidence.  Hartis=s sixth issue also concerns the
market price for the transferred goods.  There, he argues that the trial court
should have found, as a matter of law, that Athe market price for the goods was
the price specified@ in the Houston Inventory File, or alternatively, the failure
to make such a finding was against the great weight and preponderance of the
evidence.

Each of these issues requires us to
review the entire record using the same standards of legal and factual
sufficiency applicable to a jury=s answers.  See Catalina v.
Blasdel, 881 S.W.2d 295, 297 (Tex. 1994).  In evaluating legal sufficiency,
we credit evidence that supports the judgment if reasonable jurors could and disregard
contrary evidence unless reasonable jurors could not.  See City of Keller v.
Wilson, 168 S.W.3d 802, 827 (Tex. 2005). 

A party attacking the legal
sufficiency of an adverse finding on an issue on which he had the burden of
proof must demonstrate on appeal that the evidence establishes, as a matter of
law, all vital facts in support of the issue.  Dow Chem. Co. v. Francis,
46 S.W.3d 237, 241 (Tex. 2001).  If a party attacks the legal sufficiency of
the evidence supporting an adverse finding on an issue on which it did not have
the burden of proof, the party must demonstrate on appeal that no evidence
supports the adverse finding.  Arrellano v. State Farm Fire & Cas. Co.,
191 S.W.3d 852, 855B56 (Tex. App.CHouston [14th Dist.] 2006, no pet.).  When a party attacks
the factual sufficiency of a finding, we set it aside only if it is so contrary
to the overwhelming weight and preponderance of the evidence that it is clearly
wrong and manifestly unjust.  Haas v. Ashford Hollow Cmty. Improvement Ass=n, Inc., 209 S.W.3d 875, 887 (Tex. App.CHouston [14th Dist.] 2006, no pet.).








We conclude that, under the
applicable standards of review, the implied findings Hartis challenges are
supported by the record evidence.  At trial, Hartis agreed that Century offered
to apply a credit against his debt in the amount of the market value of the
third-party furniture.  Although Hartis contends that he rejected the proposal,
the trial court could have reasonably disbelieved that contention.  A finding
that the market value of the third-party furniture was equal to forty percent
of the price listed in the Houston Inventory File was supported by testimony
from Brandon Hucks regarding both valuation and actual sales price.           On
the other hand, there is no evidence in the record that Hartis offered these
goods to Century, to the public, or to any other potential purchaser at the
prices listed in the Houston Inventory File.  Regarding the prices on this
list, Hartis testified as follows:

Q:        Okay.  And where did you get the cost prices
that are listed on Exhibit Number 1 [i.e., the Houston Inventory File]?

A:        These were the prices that are entered
into our system when we receive the merchandise.

Q:        So there would be invoices when you received
itCwhen you received the merchandise that would support
these dollar figures, correct?

A:        That=s
correct.

Q:        And who has those documents?

A:        I=m not sure.[[12]]

Thus, Hartis testified regarding the
time when the figures were entered, but offered no evidence explaining what the
figures represent.  








In a bench trial, the trial court is
the sole judge of the credibility of the witnesses and may take into
consideration all the facts and surrounding circumstances in connection with
the testimony of each witness and accept or reject all or any part of that
testimony.  Nelson v. Najm, 127 S.W.3d 170, 174 (Tex. App.CHouston [1st Dist.] 2003, pet.
denied).  Thus, the trial court could have found Hartis=s testimony less than credible and
may not have inferred from his testimony that the amounts he listed in the
Houston Inventory File accurately represented the original wholesale price of
the third-party goods. 

In sum, the record is legally and
factually sufficient to support the trial court=s findings that the parties agreed to
credit Hartis=s account for the market value of the transferred third-party goods, and
the market value of these goods was forty percent of the price listed on the
Houston Inventory File.  We therefore overrule Hartis=s fourth, fifth, and sixth issues. 

D.        Testimony
of Brandon Hucks

Hartis next contends that, because
Century failed to timely designate Brandon Hucks as an expert, the trial court
erred in admitting his testimony concerning the market price for third-party
goods because Century did not show that its failure to designate Hucks as an
expert was excused for good cause, or that the failure did not unfairly
surprise or prejudice Hartis.  See Tex.
R. Civ. P. 193.6.  Hartis further contends that, in the absence of Hucks=s expert testimony concerning the
market price of the third-party goods, there is no evidence to support such a
finding.  We review the trial court=s decision to allow Hucks=s testimony for an abuse of
discretion.  See Tamez v. State, 205 S.W.3d 32, 43 (Tex. App.CTyler 2006, no pet.).

We begin our review by placing Hartis=s objection in context.  Hucks
initially testified that Century was typically able to resell its own product
for A40 to 50 cents on the wholesale
dollar@ when the product is out of the box
and has been displayed in a showroom; moreover, he has personally had
experience reselling such furniture.  He further testified that when the
product is still in the box, Century can sell it to liquidators for A50 to 60 cents on the wholesale
dollar.@  Hucks also testified that he had
made such a sale the day before trial with a Houston retailer or liquidator. 








Hartis did not object to any of this
testimony on the grounds that Hucks was an undesignated expert.  He raised this
objection only when Hucks was subsequently asked Ahow did you arrive at 40 percent as a
discount for this third-party merchandise?@  Hucks responded: 

The decision points [sic] to credit
Mr. Hartis 40 percent of the listed price of his inventory was based on the
prior experience that I have in selling items of first quality in the boxCslow turning, in the box, for 50 to
60 cents on the wholesale dollar, in my experience.  And my experience of
selling our showroom samples, that I assume would be in similar condition to
what Mr. Hartis had on his floor, at 40 to 50 cents on the wholesale dollar out
of the box.  So the 40 cent basis came from basically drawing on, this is the
type expectation that we get for our goods in similar condition.

Hucks further testified that Century
actually sold the furniture for this price to its sister company, Boulevard. 

Hartis argues that A[t]estimony concerning market price
of trade goods must come from an expert,@ and in support of this contention,
relies on Cass v. Stephens.  156 S.W.3d 38, 64B65 (Tex. App.CEl Paso 2004, pet. denied).  But Cass
involves the competency of an accounting expert to testify regarding (a)
whether operators followed correct accounting procedures, (b) the market value
of converted oil and gas equipment, and (c) whether  defendants acted with
malice in converting the equipment.  It does not concern trade goods or the
necessity for expert testimony.  

Hartis next relies on 50-Off
Stores, Inc. v. Banques Paribas (Suisse), S.A., for the proposition that A[a] sale at other than arms length is
no evidence of a fair market transaction.@  180 F.3d 247, 255 (5th Cir. 1999). 
But, in that case, the Fifth Circuit Court of Appeals held that if a buyer
never intended to pay the price he negotiated for stock, then his offer is not
a useful indication of fair market value, because it only shows the price the
seller would accept and not the price an arms-length purchaser would pay.  Id. 
Here, however, Hucks testified without objection regarding the price an
arms-length purchaser would pay. 








Finally, Hartis contends that the
trial court was required to accept the figures included in the Houston
Inventory File as the market value or the agreed value of the third-party
goods.  Specifically, Hartis argues that A[w]hile the fact finder is ordinarily
free to disbelieve even uncontroverted testimony, in a proper case such
testimony, even that of an interested witness, establishes the matter testified
to as a matter of law.@  In support of this argument, Hartis relies on Schwartz
v. Pinnacle Communications.  944 S.W.2d 427 (Tex. App.CHouston [14th Dist.] 1997, no writ). 


In Schwartz, we held: 

[W]hile the fact finder is charged
with the duty of deciding issues raised by conflicting evidence, when the
evidence is not conflicting, the fact finder may not disregard
uncontradicted testimony in order to decide an issue in accordance with its own
wishes.  This exception applies even when the testimony comes from an
interested witness if certain circumstances exist to ensure its reliability. 
If the interested witness=[s] testimony is clear, direct, and
positive, as well as free from contradiction, inaccuracies, and suspicious
circumstances, it is
taken as true, as a matter of law.

Id. at 434 (citations omitted, emphasis added).  The
italicized circumstances are not present here.

On appeal, Century persuasively
argues that Hucks=s testimony is admissible as the factual testimony of a lay
witness under Texas Rule of Evidence 701 because Hucks=s statements were rationally based on
his perceptions and helpful to a clear understanding of his testimony.  See Tex. R. Evid. 701 (restricting the
opinion testimony of a lay witness to Athose opinions or inferences which
are (a) rationally based on the perception of the witness and (b) helpful to a
clear understanding of the witness=[s] testimony or the determination of
a fact in issue@).  Century further argues that expert testimony is not
required to prove reasonable price or actual damages.  See Laprade v.
Laprade, 784 S.W.2d 490, 492 (Tex. App.CFort Worth 1990, pet. denied)
(stating that Ait is largely discretionary with the judge as to whether a witness is
qualified to testify as to market value@ and holding that the trial court did
not err in admitting lay witness testimony concerning the value of a business
where the witness had knowledge of the business=s accounts receivable, had run the
business for five years, knew what was paid for each of the business=s trucks, and knew the value of
other, smaller businesses for sale).  We agree with both contentions. 
Moreover, the testimony to which Hartis objected is cumulative of evidence
previously admitted without objection, and thus error, if any, is harmless.  








We hold the trial court did not abuse
its discretion by admitting the challenged testimony, and we overrule Hartis=s seventh issue.

E.        UCC
Financing Statement            

In his ninth issue, Hartis contends
that the trial court should have granted a new trial because Century failed to
produce a controlling document in discovery.  Specifically, Hartis complains
that Century did not produce a requested UCC financing agreement until after
trial.  Although Century moved to reopen the evidence to admit the document, Hartis
objected.  Hartis now argues that the document contains a provision that
requires it to be interpreted under North Carolina law, and that Century failed
to comply with North Carolina statutes that prevent a secured party from
recovering a deficiency unless that party proves (a) notice of planned
disposition complying with the statute and (b) commercially reasonable
disposition of the collateral.  Hartis contends that no evidence of a notice of
disposition was offered, and, if we exclude Hucks=s testimony regarding market value,
no evidence of commercial reasonableness is in the record.

First, in his motion for new trial,
Hartis made no argument based on North Carolina law.  Thus, these arguments are
waived.  Tex. R. App. P. 33.1. 
Second, inasmuch as Hartis objected to the reopening of the evidence and asked
the trial court to exclude the document as untimely and as a discovery
sanction, Hartis has already been granted the relief he sought, and the court=s error, if any, was invited.  Hartis
is therefore estopped from raising this issue on appeal.  See Tittizer v.
Union Gas Corp., 171 S.W.3d 857, 861 (Tex. 2005) (per curiam). For each of
these reasons, we overrule Hartis=s ninth issue.

F.        Compliance with Article Nine of the Uniform
Commercial Code 








In a related argument, Hartis
contends that the trial court should have held that Century=s failure to sell the third-party
goods in a manner complying with Article Nine of the Uniform Commercial Code disqualified
it from recovering a deficiency from Hartis.  This argument depends on the
admission of the security agreement, and Hartis successfully argued for its
exclusion.  Here, too, the court=s error, if any, was invited; thus
Hartis is estopped from raising this issue on appeal.  See id. 
Accordingly, we overrule Hartis=s tenth issue.

G.        Attorneys= Fees

Finally, Hartis argues that the attorneys= fee award should be vacated because
the damage award must be reversed.  For the reasons discussed above, this
argument is without merit.  In the alternative, he asks us to reform the
judgment because the trial court awarded fees exceeding the amount stipulated.[13] 
Specifically, at the close of Century=s case-in-chief, Century=s attorney, Patrick J. Schurr,
recited the parties= stipulation that Century=s Aattorneys= fees will be $18,000 through the date
of trial@ and that the fees for Hartis=s attorney, Joseph A. McDermott, III,
were $16,000.  He added, AAnd then, appellate fees of $2,500 for Motions for New Trial,
Court of Appeals, et cetera.@  McDermott then added that the parties stipulated Ato an amount, not entitlement . . . .@  The trial court accepted the
stipulation, but after the close of evidence, requested post-trial briefing on
the application of the Uniform Commercial Code.








Ordinarily, the amount of attorneys= fees awarded rests within the sound
discretion of the trial court and will not be reversed absent a showing of
abuse of that discretion.  Ragsdale v. Progressive Voters League, 801
S.W.2d 880, 881 (Tex. 1990) (per curiam).  Here, no such abuse of discretion has
been demonstrated.  When a contract case is tried without a jury, the trial
court may take judicial notice of (1) the contents of the file to estimate the
work involved; and (2) the customary fee for the claim involved, which is
presumed to be reasonable.  Tex. Civ.
Prac. & Rem. Code Ann. ' 38.004(1) (Vernon 1997); Lee
v. Perez, 120 S.W.3d 463, 469 (Tex. App.CHouston [14th Dist.] 2003, no pet.);
Hon. Scott A. Brister, Proof of Attorney=s Fees in Texas, 24 St. Mary=s L.J. 313, 333 (1993).  The trial court is
not bound by stipulations or uncontroverted evidence regarding attorneys= fees.  See Jackson v.
Barrera, 740 S.W.2d 67, 68B69 (Tex. App.CSan Antonio 1987, no writ) (holding that a stipulation is Asome evidence@ of attorneys= fees); Nat=l Mar-Kit, Inc. v. Forrest, 687 S.W.2d 457, 460 (Tex. App.CHouston [14th Dist.] 1985, no writ)
(affirming award of attorneys= fees that differed from the uncontroverted evidence).  We
therefore assume that, after requesting post-trial briefing, the trial court
took judicial notice of the usual and customary fees for the additional work
and the efforts of the attorneys, and added a reasonable sum to the previously
stipulated amount.  See Lacy v. First Nat=l Bank of Livingston, Tex., 809 S.W.2d 362, 367 (Tex. App.CBeaumont 1991, no writ) (noting that
the trial court is presumed to have taken judicial notice of reasonable and
customary attorneys= fees).  We overrule Hartis=s eleventh issue.

IV.  Conclusion

We hold the trial court properly
placed the burden on Hartis to prove the elements of his counterclaim and
affirmative defenses, and the evidence supports the trial court=s express or implied findings of fact
and conclusions of law.  We further hold the trial court did not abuse its
discretion in admitting the testimony of Brandon Hucks.  Finally, we presume
that in awarding attorneys= fees, the trial court considered the parties= stipulations and took judicial
notice of the reasonable and customary fees in the area for the work
performed.  We overrule Hartis=s remaining issues under the doctrines of invited error and
waiver, and affirm the judgment of the trial court.

 

 

 

 

/s/        Eva M. Guzman

Justice

 

Judgment rendered and Opinion filed
June 28, 2007.

Panel consists of Chief Justice
Hedges and Justices Hudson and Guzman. 









[1]  Century also sold furniture directly to Showroom.





[2]  The wholesale value of the missing furniture was
$225,206.64.





[3]  Century did not insist on payment of the full
amount, but instead agreed to accept $89,527.75 in full satisfaction for these
sales. 





[4]  Neither file is in the record.





[5]  This amount is approximately $29,766.25 less than
the value of the consigned goods reported by Hartis in his earlier email.  





[6]  Hucks also testified that on the day before trial,
he completed a transaction with a retailer that conducts operations in Florida
and Houston.  According to Hucks, the furniture sold in this transaction was
valued at A50 cents on the dollar.@





[7]  The attorneys=
fee award consisted of $20,000 incurred in obtaining the judgment, $2,000 if
Century should successfully defend an attack on the judgment prior to appeal,
$2,000 if Century succeeded in an appeal to the court of appeals, and $2,000 if
Century succeeded in an appeal to the Texas Supreme Court.





[8]  Moreover, this court does not follow Olney,
but has instead stated that A[c]ommercial
reasonableness is a defense which must be pled by the debtor, not an element of
the lender=s cause of action.  Only after the affirmative defense
of commercial reasonableness is asserted, does the lender have the burden to
offer proof that the sale was commercially reasonable.@  McDonald v. Foster Mortgage Corp., 834 S.W.2d
573, 576 (Tex. App.CHouston [14th Dist.] 1992, writ denied) (citation
omitted); see also Tex. Prop.
Code Ann. ' 51.003 (Vernon 2007); Sowell v. Resolution
Trust Corp., No. 14-92-00320-CV, 1996 WL 233727, at *3 (Tex. App.CHouston [14th Dist.] May 9, 1996, no pet.)
(recognizing that the sale of real property need not be reasonable, thus, the
lender=s receiver is not required to prove a foreclosure sale
was reasonable to recover a deficiency from the guarantor).  Other courts do
not recognize such a defense at all.  See Pentad Joint Venture v. First Nat=l Bank of La Grange,  797 S.W.2d 92, 95B97 (Tex. App.CAustin 1990, writ denied).





[9]  In the alternative, Century argues that, by failing
to object (as required by section 2.201(b) of the Code) to its Aconfirmatory@
email stating that it would credit 40% of the value stated by Hartis to his
debt, Hartis entered an enforceable agreement under section 2.207.  See Tex. Bus. & Com. Code Ann. '' 2.201(b), 2.207 (Vernon 1994).  This argument,
however, is contrary to the trial court=s
finding that Hartis failed to prove the existence of a valid agreement and that
any such agreement would have been unenforceable under section 2.201.  See
id. ' 2.201(a) (AExcept
as otherwise provided in this section . . . .@).  Century also relies on section 2.305(d) to argue that the parties
never intended to contract in the absence of an agreement on price, and thus,
the law implies a reasonable price.  See id. ' 2.305(d).  We do not reach this argument.





[10]  Hartis later disclosed that this inventory was
current only as of December 31, 2002.





[11]  We note that Hartis asked the trial court to
memorialize these implied findings in additional findings of fact, and that the
trial court refused his request.  Hartis does not challenge the trial court=s refusal to make his requested additional findings,
and neither party contends that this refusal precludes us from treating these
findings as implied.  See Vickery v. Comm=n for Lawyer Discipline, 5 S.W.3d 241, 253 (Tex. App.CHouston [14th Dist.] 1999, pet. denied) (suggesting
that a finding of fact that was expressly refused by the trial court cannot be
supplied by implication on appeal).  We therefore presume the parties agree
that the requested additional findings were Adisposed
of directly or indirectly by the original findings, and the failure to make
additional findings was not prejudicial to the appellant.@  See Levine v. Maverick County Water Control &
Improvement Dist. No. 1, 884 S.W.2d 790, 796 (Tex. App.CSan Antonio 1994, writ denied).





[12]  Hartis further testified that he owns 100% of the
stock in Showroom, and that the company filed for bankruptcy.  However, Hartis
did not produce the invoices to the bankruptcy trustee, although the invoices
would list the wholesale value of these goods. 





[13]  Hartis does not challenge Schurr=s qualifications or the award of attorneys= fees generally.  He also does not allege that the
attorneys= fees stipulated or awarded include payment for legal
work performed solely in connection with Century=s fraud and conversion claims.  Rather, his entire argument for reformation
of the attorneys= fee award consists of the single sentence, AAlternatively, the award of fees is greater than the
parties= stipulation and should be reformed to that amount.@